# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE CORPORATION FOR PUBLIC BROADCASTING, 401 Ninth St., NW Washington, DC 20004 | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.    25-cv-740 |
| THE FEDERAL EMERGENCY MANAGEMENT AGENCY, 500 C Street, SW Washington, DC 20472 | ) ) ) ) ) | |
| and | ) ) | |
| CAMERON HAMILTON, in his Official Capacity as Senior Official Performing the Duties of the FEMA Administrator, 500 C Street, SW Washington, DC 20472 | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

This is an action brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, for injunctive and declaratory relief arising from a purported "hold" placed on grant funds that are due and owing under a grant awarded by the U.S. Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA") to the Corporation for Public Broadcasting ("CPB") relating to the Next Generation Warning System (NGWS) for the nation's emergency alert system. FEMA has not identified any reason for this "hold", and the

adverse effects of FEMA's failure to process submissions under the NGWS Grant severely and negatively impacts the ability of federal, state, and local authorities to issue real-time emergency alerts.  The implementation of the NGWS Grant is necessary to "[c]reate and maintain a resilient public alert and warning system that provides timely and effective warnings, especially including areas that are traditionally underserved by broadcast providers."[1]  The NGWS Grant was issued in 2022 as part of the government's efforts to modernize the national emergency alert system that provides critical emergency and life-saving information to the public  In awarding the NGWS Grant, the Department of Homeland Security and FEMA recognized that modernizing the national emergency alert system is "imperative" and an "essential part of America's emergency preparedness."

FEMA's hold on these funds is arbitrary, capricious, an abuse of discretion, in violation of law, and undermines the emergency alert system relied upon throughout the nation by millions of people whose only access to emergency information is through publicly-issued alerts by public broadcasting stations.  The arbitrary and unlawful nature of FEMA's failure to allow CPB to submit reimbursements and receive payments owing to forty-two (42) sub-awardee public media stations, which have, in turn, committed funds to purchase critical equipment for NGWS program upgrades and enhancements in furtherance of the public interest, is clear cut.  Indeed, FEMA did not even attempt to explain its unilateral conduct before the imposition of the "hold," which violates the NGWS Grant and the Uniform Guidance, 2 C.F.R. § 200, nor has it attempted to date to explain the basis for its action.

---

[1] https://www.fema.gov/sites/default/files/documents/fema_ncp-fy24-ngwsgp-nofo.pdf

## Parties

1. The Corporation for Public Broadcasting is a District of Columbia nonprofit corporation created pursuant to the Public Broadcasting Act of 1967, 47 U.S.C. § 396. CPB is the steward of the federal government's investment in public broadcasting and the largest single source of funding for public radio, television, and related online and mobile services. In addition, CPB administers several grant programs including NGWS.

2. The Federal Emergency Management Agency is a federal agency charged with addressing disasters and emergencies. FEMA is a component of the Department of Homeland Security ("DHS"). FEMA is headquartered in Washington D.C.

3. Cameron Hamilton is currently the Senior Official Performing the Duties of the FEMA Administrator. Mr. Hamilton's office is located in Washington, D.C.

## Jurisdiction and Venue

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the APA.

5. Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C. and a substantial part of the events or omissions giving rise to CPB's claims occurred here.

## Factual Background

6. In creating the CPB, Congress made specific findings about national interests in public broadcasting, including:

   a. "it is in the public interest to encourage the growth and development of public radio and television broadcasting, including the use of such media for instructional, educational, and cultural purposes;" 47 U.S.C. § 396(1);

b. "the encouragement and support of public telecommunications, while matters of importance for private and local development, are also of appropriate and important concern to the Federal Government;" 47 U.S.C. § 396(4);

c. "it is necessary and appropriate for the Federal Government to complement, assist, and support a national policy that will most effectively make public telecommunications services available to all citizens of the United States;" 47 U.S.C. § 396(7);

d. "public television and radio stations and public telecommunications services constitute valuable local community resources for utilizing electronic media to address national concerns and solve local problems through community programs and outreach programs;" 47 U.S.C. § 396(8); and

e. "it is in the public interest for the Federal Government to ensure that all citizens of the United States have access to public telecommunications services through all appropriate available telecommunications distribution technologies[.]" 47 U.S.C. § 396(9).

### Public Media's Role In The National Emergency Alert System

7. The Emergency Alert System (EAS) is a national public warning system used by federal, state, local, and tribal authorities to deliver important and timely emergency information, such as alerts about flash floods, blizzards, tornados, hurricanes, and other national and regional emergencies that affect the lives and property of citizens across the country. As the Department of Homeland Security ("DHS") recognized in its National Emergency Communications Plan issued in September 2019 (www.cisa.gov/sites/default/files/publications/19_0924_CISA_ECD-NECP-2019_1.pdf):

> Emergency communications are critical to the Nation's ability to respond to devastating natural disasters, terrorist threats, and other emergency events, incidents, and routine activities affecting our communities every day. When faced with these situations, the public safety community has a collective responsibility to share information. Achieving this goal requires communications capabilities that are resilient and secure today, yet agile enough to integrate advanced and emerging technologies tomorrow.

Id. at p.1.

8. Public television and radio stations play an integral and essential role in our nation's emergency alert system. Public media's infrastructure provides the broadest nationwide communications platform in the country, and its national-local organization allows public media entities to distribute federal, state, and regional emergency alerts and provide encrypted, geo-targeted alerts to local communities in times of public emergencies.

9. As discussed below, the U.S. government operates and maintains a national EAS, known as the Integrated Public Alert and Warning Systems ("IPAWS"), which serves a gateway between official entities that need to communicate an emergency alert and the national communications networks capable of delivering those alters to relevant public audiences.

## IPAWS SYSTEM AND EMERGENCY ALERTS

10. IPAWS was created in 2006 pursuant to Executive Order (E.O.) 13407, "Public Alert and Warning System." The President as well as federal, state, local, territorial, and tribal entities can use IPAWS to send emergency alerts. The system, managed by FEMA within DHS, is designed to receive and authenticate alerting messages from an authorized alert originator (*e.g.*, local official) and distribute that single alert across many networks at once (*e.g.*, radio, television, cell phone).

11. FEMA's website says: "[IPAWS] is FEMA's national system for local alerting that provides authenticated emergency and life-saving information to the public through mobile phones using Wireless Emergency Alerts, to radio and television via the Emergency Alert System, and on the National Oceanic and Atmospheric Administration's Weather Radio."

12. Federal, state, and local authorities apply to FEMA to participate in the IPAWS program. Once authorized, the authorities must utilize specialized software that is designed to work properly within the IPAWS system.

13. When an emergency occurs, the local authorities submit a message to IPAWS. IPAWS then validates the message, and broadcasts it to the relevant communities, including by using public broadcasting equipment. FEMA maintains a visual chart of the process on its website:[2]



14. FEMA's website drives home the importance of the IPAWS system and the emergency alerts issued through it, detailing the following real world examples of the impact of the emergency alert system[3]:

    a. "MASSACHUSETTS 11-YEAR-OLD ONE OF MANY RECOVERED THANKS TO AMBER ALERT After a stranger forced an 11-year-old girl in Springfield, Massachusetts into his vehicle, an AMBER Alert was promptly sent out, spurring the community in to action. An outpouring of videos and pictures of the suspected

---

[2] https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-system
[3] https://www.fema.gov/sites/default/files/documents/fema_ipaws_101-slicksheet_042024.pdf

kidnapper and his vehicle flooded in, providing detectives with invaluable information that led to the safe recovery of the girl and the arrest of the kidnapper."

b. "TORNADO SURVIVORS CREDIT WIRELESS EMERGENCY ALERT FOR SAVING THEIR LIVES  Survivors of a deadly tornado had more than luck to thank for their lives. At roughly 3 a.m., in the black of night, a tornado touched down in Bollinger County, Missouri, setting out on a path that left five dead and many injured and homeless. It could have been worse. A WEA sent by officials to all in the tornado's path, allowed many people to seek shelter, potentially saving their lives."

c. "POWER BLACKOUTS AVERTED THANKS TO WIRELESS EMERGENCY ALERT  Power blackouts can disrupt societies like few other disasters. They can sever communications, water supplies, and transportation; close gas stations, ATMs and grocery stores; prevent the use of medical devices; and cause mass food spoilage. A record-breaking California heatwave led to an extraordinarily high level of energy consumption. The state's power grid was strained and power blackouts were imminent. A critical WEA was sent, asking Californians to "conserve energy now". Within five minutes, energy usage had reduced across the state by nearly 2.4 percent, leaving enough power to prevent disaster."

15. Public broadcasting stations reach 99% of the American population and are the only local media in many communities. Some public stations serve as their state's primary Emergency Alert Service hub for inclement weather and Amber alerts. Between January 1, 2023, and January 1, 2024, 8,500 Wireless Emergency Alerts were issued by over 1,600 federal, state,

local, tribal and territorial authorities and transmitted over public media throughout the country.

16. For example, during the January 2025 wildfires, Southern California public media stations provided timely news and information, on air and online, to more than 18 million people. From January 7-13, 2025, local alerting authorities issued 111 geotargeted alerts, including fire weather warnings and fire outbreak alerts, evacuation warnings and orders, and curfew notices. The stations also offered real-time guides and resources for those threatened by the fires, partnering to send out daily newsletters with the latest updates from all their organizations.

17. In November 2024, when it authorized an additional $40 million in grant funding for the NGWS system for fiscal year 2025, the Senate Appropriations Committee said:  "These critical investments across the country help to support the efforts of our firefighters, emergency medical technicians, and other first responders; build resiliency in our communities; increase capacity to provide alerts and warnings; and protect communities across the country."[4]  *See also* H.R. 8752, Title III (June 28, 2024) (appropriating $40 million for NGWS grant funds).

## 2022 NOTICE OF FUNDING OPPORTUNITY AND GRANT

18. On September 22, 2022, DHS and FEMA issued a Notice of Funding Opportunity in connection with congressionally authorized funding for the Next Generation Warning System.  According to FEMA's website:  "The Next Generation Warning System Grant

---

[4] https://www.appropriations.senate.gov/news/majority/bill-summary-homeland-security-fiscal-year-2025-appropriations-bill

Program (NGWSGP) will support investments that improve the resilience and security of public broadcasting networks and systems."[5]

19. The grant was designed to:

    a. "Enable public television broadcasters to upgrade to the Advanced Television Systems Committee broadcast standard (ATSC 3.0)."

    b. "Enable public radio stations to upgrade to digital capabilities to enable broadcast of IPAWS alerts."

    c. "Enable the capability to alert, warn and provide equivalent information to individuals with disabilities, individuals with access and functional needs, and individuals with limited-English proficiency."

    d. "Enable alerts and warnings on the basis of geographic location as well as those projects that improve the ability of remote rural areas to receive alerts and warnings."[6]

20. The NOFO sets forth the importance of the grant funding: "Having in place a secure and effective system for warning and informing the public of impending natural and man-made disasters is an essential part of America's emergency preparedness. FEMA's Integrated Public Alert & Warning System (IPAWS) is the national system for local alerting that provides authenticated emergency and life-saving information to the public. Local radio and TV stations, along with cable, direct broadcast satellite, and wireless service providers disseminate the public safety messages they receive from IPAWS. This grant supports projects that aid in creating and maintaining a resilient public alert and warning system that

---

[5] https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-system/broadcasters-wireless/ngwsp
[6] https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-system/broadcasters-wireless/ngwsp

provides timely and effective warnings, especially including areas that are traditionally underserved by broadcast providers. This public alert and warning system is built on the Common Alerting Protocol standard (CAP) that permits a single CAP compatible message to activate multiple compliant warning systems and a station's' ability to maintain continuity of operations during emergencies. The Next Generation Warning System includes all available radio and television technology in the alert and warning ecosystem to expand and enhance emergency information dissemination to the public. The grant is intended to replace aging infrastructure to enhance alerting capabilities, improve resiliency, operational continuity, and security through new technology for qualified rural, tribal, and other stations who support underserved public broadcast audiences. Broadcasters may use funding to replace aging equipment and improve cybersecurity hygiene. This program supports investments that improve resiliency, continuity of broadcast operations, and security of public broadcasting networks and systems."[7]

21. As DHS and FEMA acknowledged in the NOFO, "[i]nvestments in technology, training, and support equipment creates financial burdens, especially for stations serving rural, tribal, territorial, and underserved areas. This grant is intended to alleviate these financial burdens for public broadcast stations needing to upgrade their equipment or improve their resilience during disasters. In these communities, public broadcast stations often serve as a primary source of critical emergency information compared to other areas with greater concentrations of private broadcasters."[8]

---

[7] https://www.fema.gov/sites/default/files/documents/fema_ncp-fy24-ngwsgp-nofo.pdf
[8] https://www.fema.gov/sites/default/files/documents/fema_ncp-fy24-ngwsgp-nofo.pdf

22. The NOFO also states that "The Corporation for Public Broadcasting is the only eligible applicant."[9]

23. Congress appropriated $40 million for the 2022 NGWS Grant in Public Law 117-103, at 136 Stat. 328 (March 15, 2022). CPB was awarded the NGWS Grant to administer these funds and to make sub-awards to public media stations consistent with the NOFO and associated documentation. The grant was made on a cost reimbursement basis, meaning that the public media stations would incur expenses in purchasing the critical equipment and infrastructure and then seek reimbursement from CPB which would, in turn seek reimbursement from FEMA.

24. Since that time, CPB has been diligently working with FEMA and currently has issued over forty executed contracts to sub-awardees in reliance on this grant with approximately $18.7 million fully committed. The total amount that has already been expended is $1.5-$2 million with respect to grantees, with another $780,000 already incurred with a consultant to CPB for a total of $2.25 -$2.5 million. At every stage of this process, CPB has kept FEMA fully informed of the status of the sub-awards. At no point has FEMA indicated that CPB has done anything that would call this grant into question. At no point has FEMA indicated that it is cancelling the grant or taking any other adverse action with respect to the grant.

25. As a matter of routine practice, and pursuant to the terms of the grant as well as the Uniform Guidance, 2 C.F.R. § 200, CPB expends funds then draws for reimbursement through the Payment and Reporting System ("PARS"), which includes the expenses incurred by sub-awardees under the NGWS Grant.

---

[9] https://www.fema.gov/sites/default/files/documents/fema_ncp-fy24-ngwsgp-nofo.pdf

26. On February 19, 2025, when CPB accessed PARS, it indicated that funds were "on hold," effectively meaning that there were no funds currently available under the NGWS Grant. A true and accurate screenshot of the message on the PARS system is attached as Exhibit A. As of the date of this Complaint, CPB has received no notices of FEMA – or indeed any communications of any kind – indicating that the status of this grant has changed. Below is a true and accurate screenshot from February 19, 2025:



27. FEMA's "hold" status in the PARS systems prevents CPB from submitting any further reimbursement requests under the NGWS Grant, leaving public media stations across the country with hundreds of thousands of dollars of unreimbursed expenses. To date, over $1.88 million of incurred expenses need to be reimbursed to the sub-awardees.

28. In light of FEMA's failure to allow CPB access to its NWGS Grant funding to reimburse the very sub-awardees that FEMA directed CPB to issue awards, CPB, on February 20, 2025, issued a letter to FEMA demanding that access to the funding be restored and that in the future it will abide by the terms of the Uniform Guidance. The letter also copied FEMA Office of the Chief Counsel and the Office of the General Counsel of DHS.

29. In light of the necessity for prompt action, the letter requested a response by February 24, 2025, stating:

> While CPB is reluctant to impose any deadlines, it is suffering continuing and irreparable harm for each day that passes with no clarity to the status of the grant award and no means of seeking redress through FEMA procedures. Accordingly, I must request that FEMA respond no later than the close of business on February 24, 2025.

30. As of the date of this Complaint, neither DHS nor FEMA has responded in any way to this letter. By way of limited example, FEMA has provided no explanation of what the "hold" means. It has not provided any explanation for the reason for the "hold." It has not provided any schedule for resolving the hold.

31. A day after the February 24, 2025 deadline, the U.S. District Court for the District of D.C. issued a preliminary injunction in National Council of Nonprofits, et al. v. Office of Management and Budget, et al., Case No. 1:25-cv-002399-LLA, ordering that the government instruct all agencies that they "not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal Funds under all open awards. It shall also instruct those agencies to continue releasing any disbursements on open awards that were paused due to OMB Memorandum M-25-13." (ECF Doc. No. 51). Accordingly, this "hold" must be construed as a separate and independent agency action that must itself comply with the APA.

32. On the afternoon of Friday, February 28, 2025, FEMA sent out a general email purporting to go to all recipients of any grant from FEMA. The email did not respond to CPB's communication regarding the NGWS Grant, and provided no details on the reasons for the hold other than FEMA was seeking "to ensure the alignment of its grant programs

with Secretary Noem's direction." It provided no details as to what that means or when

any "alignment" would be complete. Similarly, it did not address how grantees, such as

CPB, are to deal with costs already incurred.

33. FEMA also sought to impose additional requirements not included in the NGWS Grant or

the Uniform Guidance, stating:

    a. As part of the manual review of your payment request, FEMA strongly
       encourages recipients to include the following information when submitting new
       payment requests:

        i. Will this disbursement go to any subrecipients, and if so, which ones?

        ii. What is the total amount of funds going to each subrecipient?

        iii. What activities will be funded by this disbursement?

        iv. What is the time period covered by this payment request?

       … Please note that if FEMA does not receive this information, payment requests
       will not be processed.

34. Not only was this outside of prior practice and the Uniform Guidance, FEMA has imposed

demands that were impossible to comply with. Specifically, after receiving this email, CPB

attempted to access the PARS portal to provide this additional information for the

outstanding reimbursement requests but the PARS portal was inactive, and did not allow

CPB to submit any information. Consequently, there is no way for CPB to submit any

information to FEMA due to FEMA's inactivation of the PARS portal.

35. The February 28, 2025 email from FEMA concluded with the sentence: "[f]or questions,

please reach out to your designated FEMA point of contact for the specific grant award."

Yet, when CPB contacted its FEMA representatives for the NGWS Grant, the

representative could not provide any information as to why the "hold" was in place, why

reimbursement requests could no longer be made, or how the situation could be resolved.

As noted above, legal counsel to FEMA and DHS have remained similarly unresponsive.

36. On March 6, 2025, the U.S. District Court for the District of Rhode Island in <u>New York, et al v. Trump, et al</u>, Case No. 25-cv-39-JJM-PAS issued a preliminary injunction directing numerous federal agencies that were defendants in that case, including DHS, that:

> The Agency Defendants are enjoined from reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 (the "OMB Directive") with respect to the disbursement and transmission of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations.

> The Agency Defendants are enjoined from pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, including funding freezes dictated, described, or implied by Executive Orders issued by the President before rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress.

37. The Court further directed that the "Agency Defendants shall also instruct those agencies to release and transmit any disbursements to the States on awarded grants, executed contracts, or other executed financial obligations that were paused on the grounds of the OMB Directive and Executive Orders included by reference therein or issued before the rescission of the OMB Directive."

38. In its decision, the U.S. Court for the District of Rhode Island also noted FEMA's apparent disregard of the preliminary injunction issued by the D.C. District Court, noting that the "States filed another motion to enforce the TRO on February 28, 2025 relating to

FEMA funds that continue to be frozen despite the Court's TRO and subsequent

clarifying orders. ECF No. 160. The Court will address that motion later in this Order."

In so doing, the Court then ordered that.:  "In light of the States' second motion to

enforce the TRO, ECF No. 160, Defendant Federal Emergency Management Agency

("FEMA") shall file a status report on or before March 14, 2025, informing the Court of

the status of their compliance with this order."

39. The injunction further directed that:

> The Defendants must provide written notice of this Order to all federal
> departments and agencies to which the OMB Directive was addressed. The
> written notice shall instruct those departments and agencies that they may
> not take any steps to implement, give effect to, or reinstate under a
> different name or through other means the directives in the OMB Directive
> with respect to the disbursement or transmission of appropriated federal
> funds to the States under awarded grants, executed contracts, or other
> executed financial obligations.

40. Accordingly, FEMA must justify its action based solely on the explanations provided

before the "hold" – that is, it must explain why its total silence passes APA muster.

## **Legal Framework for Grant Payments**

41. Termination of the grant is governed by the Uniform Guidance and the terms of the NOFO.

The NOFO provides:

> If a recipient fails to comply with the terms and conditions of a federal
> award, FEMA may terminate the award in whole or in part. If the
> noncompliance can be corrected, FEMA may first attempt to direct the
> recipient to correct the noncompliance. This may take the form of a
> Compliance Notification. If the noncompliance cannot be corrected or the
> recipient is non-responsive, FEMA may proceed with a Remedy
> Notification, which could impose a remedy for noncompliance per 2 C.F.R.
> § 200.339, including termination. Any action to terminate based on
> noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-
> 200.342 as well as the requirement of 2 C.F.R. § 200.340(c) to report in
> FAPIIS the recipient's material failure to comply with the award terms and
> conditions. See also the section on Actions to Address Noncompliance in
> this notice.

42. CPB has not received either a Compliance Notification or a Remedy Notification. Indeed, such notifications would not have been justified in fact or in law since CPB is in full compliance with the terms of the award.

43. Turning to the Uniform Guidance, with respect to termination of a grant, it provides:

> The Federal agency or pass-through entity **must** provide written notice of termination to the recipient or subrecipient. The written notice of termination should include the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable.

2 C.F.R. § 200.341 (emphasis added).

44. Put simply, the Uniform Guidance provides one and only one way to properly terminate a grant: there must be a written notice of termination. A grant may not be terminated *sub silentio* by withholding reimbursement funds through PARS.

45. The Uniform Guidance contains additional requirements.

> The Federal agency **must** maintain written procedures for processing objections, hearings, and appeals. Upon initiating a remedy for noncompliance (for example, disallowed costs, a corrective action plan, or termination), the Federal agency **must** provide the recipient with an opportunity to object and provide information challenging the action. The Federal agency or pass-through entity **must** comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved.

2 C.F.R. § 200.342 (emphasis added).

46. These requirements are not optional. To date, FEMA has not conformed its conduct to these requirements.

47. In the absence of proper termination, The Uniform Guidance mandates prompt payment.

> Payments for allowable costs **must not be withheld** at any time during the period of performance unless required by Federal statute, regulations, or in one of the following instances:
>
> > (i) The recipient or subrecipient has failed to comply with the terms and conditions of the Federal award; or

> (ii) The recipient or subrecipient is delinquent in a debt to the United States as defined in OMB Circular A-129, "Policies for Federal Credit Programs and Non-Tax Receivables." Under such conditions, the Federal agency or pass-through entity may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to the Federal Government.

2 C.F.R. § 200.305 (emphasis added).

48. Prior to February 19, 2025, FEMA would typically issue payment to CPB through PARS within two business days of a submitted request.

## **Irreparable Injuries**

49. CPB is statutorily prohibited from using its general operating funds to pay for NGWS Grant expenses or to reimburse sub-awardees for their NGWS Grant expenses. *See, generally,* 47 U.S.C. § 396(k). CPB is contractually required to reimburse sub-awardees for expenditures made pursuant to the grant sub-awards. Although CPB has other funding, such funding is statutorily required to be used for other purposes. It would violate such statutory mandates to repurpose such funding, even on an interim basis, to the NGWS program.

50. There are many stations who have expended money in reliance on the reimbursement under the grant. For example, KBRW in Utqiagvik, Alaska,[10] has spent about $98,000 of its sub-award of up to $98,853, none of which has been reimbursed. *See* https://www.webcenterfairbanks.com/2025/02/26/alaska-emergency-warning-system-upgrades-paused-amid-fema-funding-questions/.

---

[10] Utqiagvik is also known as Barrow.

51. KBRW is the only broadcast entity serving the nearly 95,000 square mile North Slope Borough of Alaska. The North Slope is located predominantly above the Arctic Circle, and the majority of communities there have limited or no internet access. KBRW is the only source of information for most of the approximately 12,000 people who live there.

52. Similarly, news articles in northern New York report that "The North Country's ability to receive timely and reliable alerts about flash floods, blizzards, tornadoes, and other emergencies is in jeopardy" due to "hold" imposed by FEMA. The article further notes that the radio station "was directed by the granting organization to purchase the equipment and perform the work required and approved to complete the project, but reimbursed is now in doubt." According to the news article, this station has "34 transmitters" that "can reach more than a half-million people across an area the size of Switzerland *See https://suncommunitynews.com/news/116239/stop-work-order-hobbles-ncpr-emergency-broadcasting/.*

53. If CPB is unable to reimburse KBRW and other sub-awardees, CPB will face imminent litigation and the stations will either have their working capital depleted or too will face litigation. There are a substantial number of station sub-awardees in similar situations.

54. Further delays in accessing funds to the NGWS Grant will also delay the implementation of the equipment needed to meet the demands of the national emergency warning system. As FEMA itself has explained:

> Having in place an effective system for warning and informing the American public of impending natural and man-made disasters is an **essential** part of America's emergency preparedness. FEMA's Integrated Public Alert & Warning System (IPAWS) is the national system for local alerting that provides authenticated **emergency and life-saving information to the public**. Local radio and TV stations, along with cable, direct broadcast satellite and wireless service providers, disseminate the public safety messages they receive from IPAWS'
> NOFO at 3.

55. FEMA further states:

> Upgrading to this advanced technology requires investments in technology, training, and support equipment that may create burdens for broadcasters, especially small stations in rural and underdeveloped areas. In these areas, public broadcast stations often serve a much larger role in providing critical emergency information than in other areas with greater concentrations of private broadcasters. The NGWSGP is intended to ease this burden for qualified public broadcast recipients of grant funding.

NOFO at 4.

56. CPB is also being placed in an impossible situation. Under the NGWS Grant, there is no right to terminate for convenience. Therefore, failure to pay the sub-awardees creates the risk of liability. If it does not terminate the sub-award, it risks increasing financial exposure with no assurance of reimbursement. Further, this untoward action has put CPB's reputation as a responsible steward of federal funds at risk.

57. Even if FEMA were to direct CPB to cancel existing contracts – which it is unclear that it has the legal authority to do – CPB could still be contractually required to pay stations for equipment already purchased, but yet could not legally make those payments. This is because CPB receives appropriated funds, and it cannot use funds appropriated by Congress for one purpose to pay obligations for a different purpose. Put simply, only NGWS Grant funds can be used to pay NGWS Grant obligations.

58. In addition to the sub-awards, CPB has at least five employees who are wholly or partly funded through the FEMA grant. Normally, CPB pays their salaries and benefits and then seeks reimbursement through PARS. The "hold" has prevented CPB from obtaining such reimbursement forcing it into the position of using other funds or either furloughing or terminating such employees with no assurance that they will be available when and if access to the FEMA grant is restored, potentially delaying implementation of equipment

necessary to update the national emergency alerting system. If CPB is unable to meet payroll for its NGWS-funded employees, that could immediately result in the furloughing of those employees.

59. CPB is challenging a specific action of withholding NGWS Grant funds. The United States has admitted in other litigation that such specific action may be subject to challenge under the APA. "[T]he APA might allow Plaintiffs to challenge specific withholdings of funds under a particular grant." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction at 29 (filed in *New York v. Trump*, CA No. 1:25-cv-39-JJM (Feb. 12, 2025)).

60. The FEMA "hold" action has led to legal consequences and constitutes final agency action.

61. In taking such action, FEMA has ignored the significant reliance interests of CPB and the sub-awardees.

## Claims for Relief

### Count I
### Violation of the Administrative Procedure Act – 706(2)(A)

62. CPB restates and realleges all paragraphs above as if fully set forth here.

63. FEMA is an agency under the APA. 5 U.S.C. § 551(1).

64. Under the APA, a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

65. The FEMA action is arbitrary and capricious in multiple respects.

66. If FEMA's "hold" is not a unilateral and unexplained action, then it appears to be in direct violation of numerous injunctions issued by the federal courts relating to the attempt to freeze agencies from spending or disbursing funds appropriated by Congress. If it is such

a unilateral action, then it cannot rely on any post-hoc justification, and certainly not one that contains no meaningful grant-specific information or timeline.

67. The "hold" is not an action recognized either by the NOFO or the Uniform Guidance. Put simply, there is no such action that is legally cognizable.

68. To the extent the "hold" does not terminate the NGWS Grant, then it is inconsistent with the terms of the grant and inconsistent with the Uniform Guidance which requires prompt payment of monies due to a grantee.

69. To the extent the "hold" is intended to terminate the NGWS Grant, it fails to comply with the explicit procedures set forth in the Uniform Guidance, (i) because there is no basis to terminate the grant, and (ii) it abrogates the obligation to allow CPB to appeal from any termination.

70. Moreover, the Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq*., circumscribes FEMA's authority to immediately, categorically, and indefinitely pause obligated grant funding. The Impoundment Control Act permits FEMA to impound (*i.e.*, decline to spend) federal funds only under a very narrow set of specific circumstances. The Impoundment Control Act does not permit FEMA to unilaterally, categorically, immediately, and indefinitely freeze disbursement of federal funds.

71. The "hold" fails to account for the substantial reliance interests in the ordinary processes of federal grantmaking. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

In this particular case, the reliance interests are explicit and intended as part of the grant award and the CPB sub-awards.

72. Third, to the extent that the "hold" is intended to allow for some form of internal review of grants issued by FEMA, it fails to articulate why such review of existing grant programs requires an immediate cessation of this specific grant, notwithstanding the immense disruption that will cause, and why that review could not simply be conducted while existing obligations and disbursements continue as normal. Indeed, the FEMA action contains no explanation whatsoever and no clarification has been issued by FEMA.

73. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

74. That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

75. Because FEMA provided no reasoned basis – indeed no basis at all – for imposing the "hold" and failed to consider the consequences of its actions, that action was arbitrary and capricious.

**Prayer for Relief**

WHEREFORE, plaintiffs pray that this Court:

    a.  Declare unlawful and set aside the "hold" as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A);

    b.  Pursuant to 5 U.S.C. § 706, vacate FEMA's actions implementing the "hold";

    c.  Issue a temporary restraining order and preliminary injunction barring FEMA and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce the "hold" and requiring that full payments under the grant proceed;

    d.  Issue a temporary restraining order and preliminary injunction barring FEMA and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce the "hold" and from interfering with the payments to CPB under the grant.

    e.  Order defendants to file a status report with the Court within twenty-four hours of entry of a temporary restraining order, and at regular intervals thereafter, confirming the regular disbursement of funds pursuant to the grant and reporting all steps that FEMA and its officers, employees, and agents have taken to comply with the Court's temporary restraining order;

    f.  Issue a permanent injunction barring FEMA and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce the hold;

    g.  Award CPB its costs, reasonable attorney's fees, and other disbursements as appropriate; and

    h.  Grant such other relief as the Court deems necessary, just, and proper.

Date:  March 13, 2025

By: **_/s/ Jason W. McElroy_**

Jason W. McElroy (D.C. Bar No. 502733)

Peter C. Nanov (D.C. Bar No. 230021)

SAUL EWING LLP

1919 Pennsylvania Avenue NW, Suite 550

Washington, D.C. 20006

Tel: (202) 295-6605

jason.mcelroy@saul.com

peter.nanov@saul.com

Jeffrey S. Robbins (*Pro Hac Vice forthcoming*)

Joseph D. Lipchitz (*Pro Hac Vice forthcoming*)

SAUL EWING LLP

131 Dartmouth St.

Suite 501

Boston, MA 02116

Tel:  (617) 912-0941

Email: jeffrey.robbins@saul.com

        joseph.lipchitz@saul.com

**_Counsel for The Corporation for Public Broadcasting_**