# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CORPORATION FOR PUBLIC BROADCASTING, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )   Case No. 1:25-cv-0740 (TJK) |
| THE FEDERAL EMERGENCY MANAGEMENT AGENCY, | ) ) ) ) |
| and | ) ) |
| CAMERON HAMILTON, in his Official Capacity as Senior Official Performing the Duties of the FEMA Administrator, | ) ) ) ) |
| Defendants. | ) ) ) |

## PLAINTIFF THE CORPORATION FOR PUBLIC BROADCASTING'S MEMORANDUM IN SUPPORT OF ITS <u>MOTION FOR A PRELIMINARY INJUNCTION</u>

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ...................................................................................... ii

**FACTUAL BACKGROUND** ..................................................................................... **5**

FEMA's Messages On PARS Reflecting Payment Was On "Hold" ........................... 9

CPB Sends A Formal Letter to FEMA, Seeking An Explanation For Its Conduct ................... 10

FEMA's General Email To All Recipients Of A FEMA Grant ................................. 10

The Harm To CPB, Its Sub-Awardees, and The Public At Large ............................. 15

**STANDARD OF REVIEW** ...................................................................................... **20**

**ARGUMENT** .......................................................................................................... **21**

    **I.**    **CPB Is Likely To Succeed On The Merits Of Its Claim** ........................ **21**

        a.    FEMA's Closure of the PARS Portal Is Arbitrary And Capricious ........................... 22

        b.    FEMA's Closure of the PARS Portal Is Contrary To Law, In Excess Of Statutory Authority, And Ultra Vires ................................... 24

    **II.**    **CPB, its Sub-Awardees, And The Public Will be Irreparably Harmed Without a Preliminary Injunction** ..................................................... **27**

        a.    FEMA's Actions Have Frustrated CPB's Mission To Effectuate the NGWS Grants . 29

        b.    FEMA's Actions Endanger Citizens ............................................................. 32

        c.    FEMA's Actions Have Harmed, and Continue to Harm, CPB's Goodwill ................ 33

    **III.**    **The Public Interest and the Balance of Equities Favor The Entry of A Preliminary Injunction** ......................................................................... **34**

    **IV.**    **The Court Should Impose No Bond Requirement on CPB** ..................... **36**

**CONCLUSION** ....................................................................................................... **37**

# TABLE OF AUTHORITIES

## CASES

*AIDS Vaccine Advocacy Coalition*,
    2025 WL 752378 (D.D.C. March 10, 2025)................................................................27, 28, 37

*Am. Bar Ass'n v. U.S. Dep't of Justice*,
    Case No. 25-cv-1263, 2025 WL 138891 (D.D.C. May 14, 2025)..........................................27

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014)..........................................................................................22

*Beattie v. Barnhart*,
    663 F. Supp. 2d 5 (D.D.C. 2009).........................................................................................27

*Brennan Center for Justice at NYU School of Law v. Dep't of Commerce*,
    498 F. Supp. 3d 87 (D.D.C. 2020).......................................................................................31

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020).....................................................................................34

*Chaplaincy of Full Gospel Churches v. England*,
    454 F. 3d 290 (D.C. Cir. 2006)......................................................................................20, 21

*City of New York v. Trump*,
    Case 1:25-cv-01510 (S.D.N.Y. February 21, 2025) ..............................................................9

*Climate United Fund v. Citibank, N.A.*,
    __ F. Supp. 3d __, 2025 WL 1131412 (D.D.C. April 16, 2025) ...........................................23

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020).......................................................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    591 U.S. 1 (2020)................................................................................................21, 23, 24

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).............................................................................................................21

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)................................................................................................35

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70
of Alameda Cnty.*,
    415 U.S. 423 (1974)............................................................................................................20

*Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016)........................................................................21

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)..............................................................28, 29, 35

*Learning Resources, Inc. v. Trump,*
    Case No. 25-cv-1248, 2025 WL 1525376 (D.D.C. May 29, 2025)................ *passim*

*Ludlow v. Mabus,*
    793 F. Supp. 2d 352 (D.D.C. 2011)................................................................22

*Marasco & Nesselbush, LLP v. Collins,*
    6 F.4th 150 (1st Cir. 2021)............................................................................23

*Massachusetts v. Nat'l Institutes of Health,*
    Case No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025)............... *passim*

*NAACP v. Button,*
    371 US 415 (1963)........................................................................................27

*Nalco Co. v. EPA,*
    786 F. Supp. 2d 177 (D.D.C. 2011)....................................................1, 31, 34

*Nat. Res. Def. Council, Inc. v. Morton,*
    337 F. Supp. 167 (D.D.C. 1971).....................................................................37

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    2025 WL 573764 (D. Md. Feb. 21, 2025) ................................................36, 37

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*
    763 F. Supp. 3d 36 (D.D.C. 2025)..............................................................12. 13

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget,*
    Case No. 25-cv-239, 2025 WL 597959 (D.D.C. February 25, 2025)............. *passim*

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014)........................................................................26

*New York v. Trump,*
    764 F. Supp. 3d 46 (D.R.I. 2025)..........................................................2, 3, 9, 13

*New York v. Trump,*
    Case No. 25-cv-39-JJM (D.R.I., January 28, 2025) ..........................................4, 13

*Open Communities All. v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017)....................................................28, 31, 32, 34

*Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.,*
    963 F. Supp. 1 (D.D.C. 1997) ........................................................................34

*S. Mut. Help Ass'n, Inc. v. Califano,*
    574 F.2d 518 (D.C. Cir. 1977) ......................................................................27

*TikTok Inc. v. Trump,*
    490 F. Supp. 3d 73 (D.D.C. 2020) ................................................................34

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ......................................................................................28

### FEDERAL STATUTES

2 C.F.R. §§ 200 ..............................................................................5, 8, 25, 26

5 U.S.C. § 702 ..............................................................................................21

47 U.S.C. § 396 ...............................................................................6, 32, 35

Public L. No. 114-143, April 11, 2016, 130 Stat. 327 ....................................6

Public L. No. 117-103, March 15, 2022, 136 Stat. 49 ....................................6

Public L. No. 117-103, March 15, 2022, 136 Stat. 328 ..................................7

Public L. No. 118-47, March 23, 2024, 138 Stat. 460 ....................................6

### STATE STATUTES

Exec. Order No. 13407, 71 Fed. Reg. 36975 (June 28, 2006) .........................5

Fed. R. Civ. P. 65(c) ......................................................................................36

### OTHER AUTHORITIES

https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-system
    ..........................................................................................................................5

https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-
    system/broadcasters-wireless/ngwsp ...........................................................6

The Federal Emergency Management Administration ("FEMA") has engaged in a textbook pattern of arbitrary and capricious conduct *vis a vis* the Corporation for Public Broadcasting ("CPB") by, unpredictably and without explanation, opening and closing the reimbursement submission portal ("PARS") related to the Next Generation Warning System ("NGWS") grant, which provides funding for the Congressionally-mandated and "critical" national emergency alert system that is designed to protect the lives and property of citizens across the country.   For the last four months, CPB and its sub-awardees have been subjected to FEMA's constant disruptive and destabilizing conduct, which has included freezing CPB's access to funding without notice or explanation, abruptly reversing course on critical decisions, disregarding court orders, resorting to illogical post hoc justifications, and topping it off with an utter lack of transparency toward CPB, the public, and this Court.

FEMA has now refused to either maintain CPB's access to its NGWS funding or provide advance notice and an explanation if it intends to freeze CPB's funding in the future, plunging the entire grant program for the national emergency alert system into chaos and uncertainty and rendering sub-awardees unwilling to take on the risk of being subject to FEMA's unpredictable whims.   FEMA's arbitrary conduct has now frustrated that program, which will be irreparably stalled absent an injunction. *See Learning Resources, Inc. v. Trump*, Case No. 25-cv-1248, 2025 WL 1525376, at *14 (D.D.C. May 29, 2025) (granting preliminary injunction because government's ever-changing tariff rates created "instability and unpredictability" and disrupted plaintiff's supply chain, business relations, and operations); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (finding irreparable harm where agency action would make it "difficult for [the plaintiff] to attract new customers" and the plaintiff would "suffer the loss of '[l]ong-standing clients ... [that may be] unwilling, or unable, to do business'" with them absent an

injunction).

The sequence of FEMA's arbitrary and unlawful conduct is well-documented and perpetual, with FEMA even now expressly reserving its ability to continue that conduct even as the deadline to complete the work under the Fiscal Year 2022 NGWS Grant expires in September of 2025 and the work for the NGWS Grants for Fiscal Years 2023 and 2024 has yet to commence. First, in the wake of the Office of Management and Budget issuance of Memorandum M-25-13 in January 2025, which directed all federal agencies to freeze access to appropriated funds for existing grants and programs, FEMA unlawfully and arbitrarily froze CPB's access to Congressionally-appropriated grant funds under the 2022 NGWS Grant, in flagrant disregard of the Uniform Guidance, the substantial reliance interests of CPB and its sub-awardees, and the compelling public interest. It did so without notice and without explanation by placing a self-described "hold" on the grant portal ("PARS"), blocking CPB's ability to submit expense reimbursement requests.

FEMA's self-described "hold" occurred *after* Judge AliKhan had already issued a preliminary injunction in *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, ordering that the government instruct all agencies that they could "not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal Funds under all open awards." Case No. 25-cv-239. 2025 WL 597959, at *19 (D. D.C. Feb. 25, 2025). Judge AliKhan also ordered those agencies to continue releasing any disbursements on open awards that were paused due to the OMB Memorandum M-25-13. *Id*.[1]

---

[1] FEMA's self-described "hold" also occurred *after* Judge McConnell, Jr. of the U.S. District Court for the District of Rhode Island issued a temporary restraining order against FEMA on January 31, 2025 restraining and prohibiting FEMA from "reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive." *New York v. Trump*, 764 F. Supp. 3d 46, 53 (D.R.I. 2025).

Then, after CPB was forced to file this lawsuit and move for a temporary restraining order, FEMA told this Court that its "hold," which prohibited CPB from submitting requests for the reimbursement of incurred expenses under the 2022 NGWS Grant was not a "pause," a "freeze" or a "withholding" despite funds actually being withheld from CPB and its sub-awardees. It further represented to the Court and CPB at the hearing on March 17, 2025 that access to the PARS portal should be restored within the week. That did not occur. Rather, it instituted a self-described "manual review" process that it represented to this Court was needed to "assess[] whether any request for payment is free from waste, fraud, or abuse," despite: (i) FEMA never having even suggested that there was any "fraud, waste, or abuse" in the NGWS program, and (ii) FEMA's IPAWS team having access to all of the information related to CPB's expenses, having been briefed on them, and having approved their expenditure for each action at every step.

Despite representing to this Court that its "manual review" was needed to assess "fraud, waste, or abuse," when FEMA issued it guidance for its "manual review," it claimed that it was necessary to verify whether "the payment request includes an activity involving support to aliens" and whether CPB's "work or mission involves supporting aliens," notwithstanding that the NGWS Grant has nothing to do with non-naturalized U.S. citizens.

On April 4, 2025, Judge McConnell, Jr. of the U.S. District Court for the District of Rhode Island issued his Order in *New York v. Trump*, finding that FEMA violated its prior court order by employing a "manual review process" to withhold obligated funds from appropriated grants and other programs. 1:25-cv-00039-JJM-PAS (D.R.I.), Dkt. 175 at 14. The Court found that FEMA instituted its previously undisclosed, extra-procedural process as a pretextual effort to circumvent the Court's preliminary injunction order and further that its "manual review" process was unlawful. *Id*. However, when CPB's counsel brought this Order to FEMA's attention in this case and

requested that the "manual review" process stop, FEMA refused.

But on April 21, 2025, close to two weeks after committing to maintain the manual review process regardless of the Court orders, FEMA reversed itself.  It sent an email to grant recipients explaining that it was ending the "manual review process" as a result of federal court orders declaring it unlawful in *New York v. Trump*, Case No. 25-cv-39-JJM (D.R.I.), and representing that it "will resume processing grant payment requests and obligations using the same processes and procedures it was using prior to the implementation of the manual review process."  Thereafter, FEMA returned functionality to the PARS portal such that CPB was able to submit expense reimbursement requests, which were then processed consistent with the Uniform Guidance and FEMA's pre-February protocols.

Shortly thereafter, FEMA sought to have CPB dismiss this lawsuit despite grant expenses still being incurred and the extensive work remaining to be done under the NGWS Grant.  Less than 24 hours later, on May 13, 2025, FEMA—without notice or explanation—*reversed itself again* by blocking CPB's access to submit NGWS expenses through PARS.  At that point CPB informed the Court that it required a hearing on a preliminary injunction motion and, accordingly, a briefing schedule for that motion was established, with CPB's brief initially due on Friday, June 6, 2025.

Roughly 24 hours before CPB's motion for preliminary injunction was due to be filed, FEMA *once again reversed* its position, and stated, through its counsel, that the PARS portal— first closed arbitrarily, then opened, then once again closed arbitrarily—would now be re-opened. FEMA, however, *refused* to agree to either keep the PARS portal open or to provide any advance notice and explanation if it seeks to close it in the future.

FEMA's ever-changing actions, which violate the Administrative Procedure Act, have

plunged the Congressionally-mandated NGWS program into chaos, and left the CPB, sub-awardees and the public which rely on these specific grants into needless instability and unpredictability, making it impossible to conduct the critical work for the NGWS program. Without these crucial upgrades, the vast majority of which are not complete and require advance ordering of equipment and planning for installation, CPB cannot fulfill its statutory mission and its requirements under the NGWS Grant, in contravention of Congress's mandate to upgrade the nation's lifesaving emergency alert system. The 2022 NGWS Grant is set to expire in September 2025. Because the NGWS equipment requires months of lead time to order and more lead time to install, FEMA's actions may well run out the clock on these critical improvements and enhancements to the nation's emergency warning infrastructure.

Accordingly, CPB requests that the Court enter a narrow Preliminary Injunction requiring FEMA to maintain the grant submission portal and timely process CPB's requests, consistent with the requirements set forth in 2 C.F.R. Part 200 and, if it wishes to shut down the portal in the future, to provide 30-days' notice and a written explanation for its conduct.

## FACTUAL BACKGROUND

In 2006, President George W. Bush signed an executive order creating the Integrated Public Alert and Warning System ("IPAWS"): "It is the policy of the United States to have an effective, reliable, integrated, flexible, and comprehensive system to alert and warn the American people in situations of war, terrorist attack, natural disaster, or other hazards to public safety and well-being . . . ." Executive Order ("E.O.") 13407, 71 Fed. Reg. 36975, 36975 (June 28, 2006). IPAWS is a national emergency alerting system maintained by FEMA that allows the President, as well as other federal, state, local, territorial, and tribal entities to issue emergency alerts.[2] The purpose of

---

[2] *See, e.g.,* https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-system.

IPAWS is to receive and authenticate alert messages from government officials and then distribute those alerts across many networks, such as radio, television, and cell phones.  *See* Declaration of Daryl Mintz at ¶¶ 4-5, 8 (attached hereto as Exhibit 1).  Since its creation, Congress has appropriated funds on multiple occasions for the purpose of enhancing the capabilities of the IPAWS system throughout the country.  *See, e.g.,* IPAWS Modernization Act of 2015, Pub. L. No. 114-143, 130 Stat. 327 (2016); Public Law 117-103 (March 15, 2022); Public Law 118-47 (March 23, 2024).

CPB is a nonprofit corporation authorized by the Public Broadcasting Act of 1967 and is the steward of the federal government's investment in public broadcasting.  *See* 47 U.S.C. § 396. CPB is the largest single source of funding for public radio, television, and related online and mobile services.  Public broadcasting stations reach 99% of the American population and, in many communities, the local stations serve as the primary Emergency Alert Service hub for inclement weather and Amber alerts.  Mintz Decl. at ¶¶1-2, 4-8.

CPB also administers the Next Generation Warning System Grant Program ("NGWS"), a national, multi-year, Congressionally-mandated program that is in the beginning of its execution. The NGWS supports investments to improve the resilience and security of public broadcasting networks and systems by, for example, upgrading television broadcasting systems, upgrading radio stations to digital capabilities, enabling alerts and warnings on the basis of geographic location, and improving the ability of remote rural areas to receive alerts and warnings.  Mintz Decl. at ¶¶ 8-18.[3]

IPAWS and the alerts sent through its protocol are of critical importance to the nation in times of emergency.  IPAWS is how federal, state, and local government entities quickly and

---

[3] *See    also*    https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-system/broadcasters-wireless/ngwsp.

effectively inform their citizens of things such as severe weather alerts and Amber alerts.  Between January 1, 2023, and January 1, 2024, 8,500 Wireless Emergency Alerts were issued by over 1,600 federal, state, local, tribal and territorial authorities and transmitted over public media throughout the country.  Mintz Decl. at ¶¶ 7-9.

**The NGWS Grant at Issue**

Congress appropriated $40 million to FEMA for implementation of the NGWS in 2022. Public Law 117-103, 136 Stat. 328 (March 15, 2022).  On September 22, 2022, in connection with this Congressionally-authorized funding for the NGWS, FEMA issued a grant for IPAWS (the "NGWS Grant").  *See* Declaration of Evan Slavitt (attached as Exhibit 2) at Exhibit A (attaching the Notice of Funding Opportunity ("NOFO") for the 2022 NGWS Grant).  CPB was designated to administer the NGWS Grant and to distribute sub-awards to various local public broadcasting stations ("sub-awardees") consistent with the NOFO.  Mintz Decl. at ¶¶ 9-15, 21, Exhibit A; Slavitt Decl. at ¶ 2.  Subsequent NGWS grants were issued to CPB based on Congressionally-mandated appropriations for fiscal years 2023 and 2024 to modernize and enhance the EAS.   Mintz Decl. at ¶¶ 23, 69; Slavitt Decl. at ¶ 1.

The NGWS Grant, and subsequent grants, were made on a cost reimbursement basis, meaning that the sub-awardees receive reimbursement for their expenditures on the back-end, rather than front-end prospective funding.  Pursuant to the NGWS Grant, CPB has entered into forty-two contracts with public radio stations in multiple states across the country.  Under these executed sub-awards, the public broadcasting stations are expressly "not required to match this Subaward with any amount of Subrecipient's funds."  The 2022 NGWS Grant expires on September 30, 2025.  Mintz Decl. at ¶¶ 18, 25, 34, 61; Slavitt Decl. at ¶¶ 4, 45.

The sub-award agreements include reimbursing each sub-awardee for the direct costs it

incurs to purchase the required equipment up to the amount of the sub-award. Further, the sub-award agreements explicitly incorporated the Uniform Guidance (2 C.F.R. Part 200) into each contract. CPB's contracts with the sub-awardees do not include a termination for convenience provision because the NOFO itself did not include a termination for convenience provision. Mintz Decl. at ¶ 26. The sub-awardees have already incurred over $2.7 million in expenses purchasing equipment needed to upgrade the emergency alert system that has not yet been reimbursed. Mintz Decl. at ¶¶ 18-19, 22, 25-26, 77.

In addition, CPB retained a consultant to help administer the NGWS Grant, which has resulted in CPB incurring approximately $824,358 to date, for a total of about $2.25-$2.5 million already expended. Mintz Decl. at ¶ 62. Further, CPB has at least nine staff members dedicated to this program who are funded wholly or partly through the grant with an expense rate of approximately $90,000 per month. Mintz Decl. at ¶¶22, 27, 62, 79.

Pursuant to the terms of the NGWS Grant, as well as the Uniform Guidance, CPB expends funds then draws for reimbursement through the Payment and Reporting System ("PARS"). Mintz Decl. at ¶¶ 18, 29, 79.

**OMB Issues Its Memorandum Freezing All Grant Programs**

On January 27, 2025, the Office of Management and Budget issued its Memorandum M-25-13 directing all agencies to freeze access to Congressionally appropriated funds for all existing grants and programs. On February 3, 2025, Judge AliKhan issued a temporary restraining order in *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, prohibiting the government from freezing all federal financial assistance under any open awards. 763 F. Supp. 3d 36, 58 (D. D.C. 2025).

On February 25, 2025, Judge AliKhan issued a preliminary injunction in that same case

ordering that the government instruct all agencies that they could "not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal Funds under all open awards." *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, Case No. 25-cv-239, 2025 WL 597959, at \*19 (D.D.C. February 25, 2025). The Court further directed that OMB "shall also instruct those agencies to continue releasing any disbursements on open awards that were paused due to OMB Memorandum M-25-13." *Id.*

On January 31, 2025, Judge McConnell, Jr. of the U.S. District Court for the District of Rhode Island issued a temporary restraining order against FEMA, restraining and prohibiting FEMA from "reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive." *New York*, 764 F. Supp. 3d at 53.

**FEMA's Messages On PARS Reflecting Payment Was On "Hold"**

On February 19, 2025, when CPB accessed PARS, it saw that its funds were "on hold," effectively meaning that there were no funds currently available under the NGWS Grant. Mintz Decl. at ¶¶ 29-32. FEMA did not communicate this hold to CPB; it went into effect with no notice and without any explanation. *Id.* FEMA's "hold" on reimbursement requests occurred despite this Court's February 3, 2025 issuance of a temporary restraining order prohibiting the government from freezing all federal financial assistance under any open awards. *See Id.*; Slavitt Decl. at ¶14; *Nat'l Council of Nonprofits,* 763 F. Supp. 3d at 58. FEMA has conceded in other litigation that it froze access to funding because of the OMB Memorandum. *See City of New York v. Trump*, 1:25-cv-01510 (S.D.N.Y.) (ECF Doc. 17) (FEMA's Opposition to plaintiff's motion for preliminary injunction at pp. 6-7).

**CPB Sends A Formal Letter to FEMA, Seeking An Explanation For Its Conduct**

In light of FEMA's failure to allow CPB access to its NGWS Grant funding to reimburse the very sub-awardees that FEMA directed CPB to issue awards, CPB, on February 20, 2025, sent a letter to FEMA demanding that access to the funding be restored and that in the future FEMA would abide by the terms of the Uniform Guidance.  Mintz Decl. at ¶¶ 36-37.  The letter also copied FEMA Office of the Chief Counsel and the Office of the General Counsel of DHS, seeking an explanation for FEMA's conduct.  *Id.*  To date, neither FEMA, nor DHS has responded to this letter.  *Id.*

**FEMA's General Email To All Recipients Of A FEMA Grant**

On February 28, 2025, FEMA's Grant Programs Directorate ("GPD") issued an email to all FEMA grant recipients advising that all FEMA grants are subject to "additional review."  Mintz Decl. at ¶¶38-40; Slavitt Decl. at ¶15.  The email provides no details on the reasons for the hold other than FEMA was seeking "to ensure the alignment of its grant programs with Secretary Noem's direction."  *Id.*  It provided no details as to what that means or when any "alignment" would be complete.  *Id.*  Similarly, it did not address how grantees, such as CPB, are to deal with costs already incurred.  *Id.*  Put simply, there was not even an effort to address the particularized circumstances of CPB's NGWS Grant.  *Id.*

In addition to this vague and wholly unspecific email, FEMA also imposed additional requirements not included in the NGWS Grant or the Uniform Guidance.  Mintz Decl. at ¶¶38-40.  Not only was this outside of prior practice and the Uniform Guidance, but the newly imposed demands were impossible to comply with.  *Id.*  Specifically, after receiving this email, CPB attempted to access the PARS portal to provide additional information relating to reimbursement requests, yet, because of the "hold" that FEMA had placed on the system, no information could

actually be entered into the portal, much less submitted to FEMA. *Id.* When CPB contacted its FEMA representatives for the NGWS Grant, they could provide no information as to why the "hold" was in place, why reimbursement requests could no longer be made, or how the situation could be resolved. *Id.*

**FEMA Doubles-Down On, Then Rescinds, Its "Hold" and "Manual Review" Process**

In opposing CPB's motion for a temporary restraining order, FEMA denied that there was any "hold" despite CPB being frozen out of accessing the Congressionally-appropriated funds. *See, e.g.,* Dkt. No. 14 at 1-2, 4-5. Rather, it claimed that post-grant issuance, it was instituting a self-described "manual review" process to "ensure the alignment of [FEMA's] grant programs with DHS Secretary Kristie Noem's direction," with no explanation of what was meant by the phrase "alignment of grant programs" with the Secretary's direction. *See* Dkt. No. 14-9 at 1. FEMA then claimed its "manual review" was necessary to prevent fraud, waste, and abuse despite never suggesting in any way that there was any fraud, waste or abuse in the NGWS Grant program. *See* Dkt. No. 14 at pp. 1,8. Indeed, FEMA's IPAWS team was well-aware of every expense incurred by CPB and sub-awardees before it was incurred because CPB provided FEMA with bi-weekly and monthly reports on the work to be performed and the expenses to be incurred every step of the way. Mintz Decl. at ¶¶22, 41-43; Slavitt Decl. at ¶¶7, 12.

FEMA did not restore CPB's access to the PARS system at that time, and did not provide an alternative submission platform, in the form of the ND Grants Portal, until March 19, 2025. Slavitt Decl. at ¶¶ 16-17. This portal only allowed a single request to be submitted at a time, however, and FEMA required large amounts of data included with each request, data which FEMA already possessed. Slavitt Decl. at ¶¶ 16-21; Mintz Decl. at ¶43.

11

**FEMA Seeks Information About "Aliens"**

On March 19, 2025, FEMA sent CPB an email titled "Instruction to Grant Recipients," which purported to provide additional information regarding the "manual review" process. *See* Declaration of Joseph Lipchitz at ¶¶ 6-7 (attached as Exhibit 3); Slavitt Decl. at ¶¶ 19-20; Mintz Decl. at ¶¶ 45-47. This Instruction repeatedly asked grant recipients to provide information about "aliens," including:

ii.  Whether the NGO's work or mission involves supporting aliens, regardless of whether FEMA funds support such activities.

iii. Whether the payment request includes an activity involving support to aliens.

*Id.* On March 23, 2025, CPB asked FEMA's counsel to explain why FEMA was asking for information about aliens (i.e., foreign individuals who are not naturalized U.S. citizens) given that the NGWS Grant has nothing to do with "aliens" or immigration. *Id.* However, neither FEMA nor its counsel ever explained why its "manual review" process involved inquiries about "aliens" or the relevance of that inquiry to the NGWS Grant. *Id.*

**As Part of Its "Manual Review" Process, FEMA Requested Information That It Already Had**

Due to FEMA's placing a "hold" on the PARS portal and not activating the ND Grants Portal, which only permits one expense reimbursement request to be processed at any given time, until mid-March, CPB was not able to submit its February staffing costs until March 24, 2025. Slavitt Decl. at ¶¶ 7, 12, 21; Mintz Decl. at ¶47. However, on April 3, 2025, FEMA, as part of its "manual review" asked for information about CPB's staff costs that it already had because this information was set forth in the NGWS Grant and had been previously provided by CPB on a monthly basis to FEMA's IPAWS team. *Id.* Notwithstanding this fact, CPB provided the requested information in a supplemental submission on April 4, 2025. *Id.*

On April 10, 2025, FEMA then mistakenly "rejected" a request made by CPB, requiring resubmission of information that had been submitted in full a week prior, and delaying processing of the requests even further.  Mintz Decl. at ¶48.

### The Rhode Island District Court Rules FEMA's "Manual Review" Process To Be Unlawful and "Pretextual"

On April 7, 2025, CPB reached out to FEMA, through counsel, to ask if FEMA would reconsider its "manual review" process in light of the U.S. District Court for the District of [Rhode Island]'s ruling in *New York v. Trump*, Case No. 1:25-cv-39, finding that FEMA had violated a previous order from that Court by implementing its "manual review" process.  Slavitt Decl. at ¶ 23. Specifically, the Court found that FEMA instituted its previously undisclosed, extra-procedural process as a pretextual effort to circumvent the Court's preliminary injunction order and further that its "manual review" process was unlawful:

> FEMA ***must immediately cease the challenged manual review process implemented pursuant to Secretary Noem's "Direction on Grants to Non-governmental Organizations"*** and "Restricting Grant Funding for Sanctuary Jurisdictions" memoranda-including the manual review process as described in Cameron Hamilton's March 20, 2025 Memorandum to DHS Secretary Noem.
>
> FEMA must direct notice of this Order and notice of the Court's preliminary injunction order to FEMA's leadership ***and all FEMA staff who administer these FEMA grants and other federal financial assistance***. FEMA shall provide confirmation of these notices, including the names of recipients of the notice, no later than 48 hours after this Order.

*See* 1:25-cv-00039-JJM-PAS, Dkt. 175 at 14-15 (emphasis added).

FEMA responded to CPB that it "would continue with the manual review process."  Slavitt Decl. at ¶ 24 and  Ex. F thereto; Lipchitz Decl. at ¶¶ 11-15.  But on April 21, 2025, FEMA changed course:  it issued a notice to CPB stating that, pursuant to three orders in the *New York v. Trump* matter, it would "resume processing grant payment requests and obligations using the same

processes and procedures it was using prior to the implementation of the manual review process."

*Id.*

## FEMA Reverses Itself Again And Shuts Off Access To PARS

On May 12, 2025, FEMA's Counsel reached out CPB's counsel, asking if CPB would agree to voluntarily dismiss this lawsuit now that FEMA had reverted to the pre-February 2025 process. Slavitt Decl. at ¶ 32; Lipchitz Decl. at ¶¶ 20-21.  While CPB informed FEMA that it was unsure at that time if it could dismiss the claims, CPB agreed to an extension of time for FEMA to respond to the Complaint so the parties could discuss.  *Id.*  Instead of having that conversation, FEMA unilaterally, without any notice to CPB or apparently to its counsel, turned off CPB's access to PARS again less than 24 hours after that email conversation.  *Id.*

When CPB's counsel contacted FEMA's counsel for an explanation as to FEMA's conduct, FEMA's counsel expressed surprise at the development and could provide no explanation whatsoever.  Lipchitz Decl. at ¶¶ 20-25.  After nearly a week of attempting to get an answer, FEMA's counsel, on a phone call with CPB's counsel, appeared to read a pre-prepared statement stating, "FEMA has not re-started the manual review process and other grant recipients are now being paid, but CPB is not.  That's all the information."  *Id.*  When pressed for more information as to why, FEMA's counsel stated he was only authorized to re-read the prepared statement.  *Id.*  Since that time, FEMA has provided no information on the reasons why CPB was frozen out of the PARS portal.  *Id.*

## FEMA Re-Opens PARS, But Reserves The Right To Close It Without Notice And Explanation in the Future

On June 5, 2025, the day before CPB's motion for preliminary injunction was initially due to be filed, counsel for FEMA sent an email advising that "FEMA is turning the payments back on for CPB," without any explanation as to why they had been shut off in the first place.  Lipchitz

Decl. at ¶¶ 26-27.  Moreover, when FEMA was asked to commit to keeping the PARS portal open or providing notice and an explanation before closing it in the future, FEMA refused.  *Id.*

**The Harm To CPB, Its Sub-Awardees, and The Public At Large**

As a result of FEMA's pattern of arbitrary conduct, CPB has been placed in a situation where FEMA has created unpredictability and uncertainty that has frozen not only the work under the 2022 NGWS Grant, but the subsequent NGWS grants as well.  The 2022 NGWS Grant expires on September 30, 2025.  Slavitt Decl. at ¶¶ 42, 45.  Despite multiple attempts to extend the deadline, FEMA has refused to extend the grant deadlines.  Slavitt Decl. at ¶¶ 42, 45; Mintz Decl. at ¶¶2, 18, 58, 61.

The equipment set to be purchased and installed with the NGWS Grant is critical to the ongoing ability of the sub-awardees to continue issuing emergency alerts.  Aging and obsolete equipment that could fail at any time requires replacement and many stations lack emergency backup equipment at all.  *See* Declaration of William Anderson at ¶¶ 9-15 (attached hereto as Exhibit 4) (describing critical 20 year old equipment at the ends of its service life that is obsolete and for which maintenance contracts and replacement parts are no longer being offered by the manufacturer, to be replaced); Declaration of Tim Black at ¶¶ 15-19 (attached hereto as Exhibit 5) (describing critical 15 year old equipment that is past its service life that is already failing to broadcast at optimal power and for which the station has no backup, to be replaced); Declaration of Tim Bruno at ¶¶ 11-17 (attached hereto as Exhibit 6) (describing critical 15 year old equipment past its service life to be replaced and emergency power supply to be obtained); Declaration of Gavin Dahl at ¶¶ 9-10 (attached hereto as Exhibit 7) (describing critical aging equipment that cannot reach about 100,000 residents in its broadcast region, to be replaced); Declaration of Don Dunlap at ¶¶ 13-16, 23 (attached hereto as Exhibit 8) (describing critical 23 year old equipment

that is past its service life and for which new replacement parts are no longer available, to be replaced); Declaration of Dr. Michael Gavin at ¶¶ 13-19 (attached hereto as Exhibit 9) (describing critical 22 year old equipment beyond its service life, for which replacement parts are no longer available, and which has failed multiple times in the past years, to be replaced); Declaration of Jared Griffin at ¶¶ 8, 17-18 (attached hereto as Exhibit 10) (noting that the equipment upgrades planned under the NGWS grant "are vital to [the station's] ability to continue to function and provide emergency information to [its] community"); Declaration of Mark Prasuhn at ¶¶ 13-20 (attached hereto as Exhibit 11) (describing critical 20 year old equipment that is past its service life that is no longer supported by the manufacturer for parts or service and could fail at any moment, to be replaced); Declaration of Justin Shoman at ¶¶ 12-17, 19 (attached hereto as Exhibit 12) (describing critical 50 year old equipment that repeatedly fails tests, and 30 year old equipment that poses an ecological issue, both of which to be replaced); Declaration of Josh Tomlinson at ¶¶ 10-12 (attached hereto as Exhibit 13) (describing critical 25 year old equipment past its service life, to be replaced); Declaration of Tom Yoder at ¶¶ 16-22 (attached hereto as Exhibit 14) (describing critical 10-15 year old equipment that is increasingly becomingly unreliable and for which new parts are not available, requiring retrofitting of used parts, to be replaced); Declaration of Kyle Clayton at ¶¶ 14-15, 28 (attached as Exhibit 15) (describing various critical equipment at the end of its service life due to be upgraded). Failure of that equipment would mean that these sub-awardees cannot broadcast emergency alerts. *Id.*

While some of the equipment has been purchased, the majority of the equipment approved under the 2022 NGWS Grant has not been purchased or installed due to FEMA's multiple disruptions to the expense reimbursement portal. *See* Anderson Decl. at ¶¶ 16-18; Black Decl. at ¶¶ 19-24; Dahl Decl. at ¶¶ 10-13; Dunlap Decl. at ¶¶ 21-22; Griffin Decl. at ¶¶ 14-15; Prasuhn

Decl. at ¶ 21; Shoman Decl. at ¶¶ 23-24.  Indeed, there remains over $37 million of the $40 million 2022 NGWS Grant that needs to be spent in support of the outstanding work, which must be completed by September 30, 2025.  Mintz Decl. at ¶¶19, 21, 58, 60-61; Slavitt Decl. at ¶¶ 45, 51-52.  Some of the equipment has been purchased and not installed, and because the stations did not expect the closure of the portal again, is in danger of degradation and damage due to improper long-term storage accommodations which the stations were unaware they would need.  *See* Bruno Decl. at ¶¶ 18-23; Gavin Decl. at ¶¶ 20-24; Tomlinson Decl. at ¶¶ 19-21; Yoder Decl. at ¶ 26; Clayton Decl. at ¶¶ 18, 21.

Much of the equipment approved for purchase under the NGWS Grant requires advanced ordering due to extended timelines to receive the equipment, sometimes requiring months of lead time for ordering.  *See* Black Decl. at ¶ 27 ("Obtaining a new transmitter will require at least two months, just for delivery . . . ."); Dunlap Decl. at ¶ 24 (noting that "the parts must be built to certain specifications and will take at least 3-4 months for delivery and installation"); Prasuhn Decl. at ¶ 22 (noting that ordering equipment "will require at least a couple of months' advance notice to complete the order . . . .").  In addition to the required lead time for ordering and receiving the equipment, the work required to install the specialized equipment also requires companies with specialized expertise in installing it, most of whom are in high demand and require months of lead time to schedule their services.  *See* Gavin Decl. at ¶¶ 24-26; Black Decl. at ¶ 27; Prasuhn Decl. at ¶ 22; Tomlinson Decl. at ¶¶ 14-25; Shoman Decl. at ¶¶ 23-24; Griffin Decl. at ¶ 16.  Geographic and climate constraints require this work to be performed during the summer months in many locations.  *See* Shoman Decl. at ¶ 25; Bruno Decl. at ¶¶ 21, 27; Yoder Decl. at ¶¶ 26-27; Clayton Decl. at ¶¶ 22-24.  As a result of the disruption in funding caused by FEMA's actions, these factors have been exacerbated, and the sub-awardees now doubt whether they will be able to complete the

NGWS upgrades prior to the September 2025 grant expiration without the court's intervention. *See* Anderson Decl. at ¶¶ 18-24; Black Decl. at ¶¶ 24-28; Bruno Decl. at ¶¶ 28-29; Dahl Decl. at ¶¶ 12-15; Dunlap Decl. at ¶ 24; Gavin Decl. at ¶ 26; Griffin Decl. at ¶¶ 19-20; Prasuhn Decl. at ¶ 23; Shoman Decl. at ¶¶ 28-29; Tomlinson Decl. at ¶ 26; Yoder Decl. at ¶ 28; Clayton Decl. at ¶ 25.

The sub-awardees contracted for new equipment in reliance on the grant, and expended their limited budgeted funds in reliance on the grant. *See* Declaration of Jeff Seifert at ¶¶ 12-13 (attached hereto as Exhibit 16); Declaration of Mollie Kabler at ¶¶ 16-30 (attached hereto as Exhibit 17); Declaration of Mitch Teich at ¶¶ 8-12 (attached hereto as Exhibit 18); Declaration of C. Spizarny ¶¶ 7-13 (attached hereto as Exhibit 19); Gavin Decl. at ¶¶ 13-14, 20-22. As of the date of this filing, there is approximately $2.7 million in unreimbursed expenses under the grant, all of which these public radio stations have already paid and now seek reimbursement from CPB, through FEMA. *See* Mintz Decl. at ¶ 22.

Moreover, FEMA's conduct has frustrated and prevented CPB from accomplishing the objectives and purposes of the NGWS Grant. Many of the sub-awardees serve as the primary or only source of emergency information in their communities. Seifert Decl. at ¶¶ 2-6; Kabler Decl. at ¶¶ 2-15; Teich Decl. at ¶¶ 1-6; Spizarny Decl. at ¶¶ 1-6; Gavin Decl. at ¶¶ 1-12; Anderson Decl. at ¶¶ 4-7; Black Decl. at ¶¶ 6, 12; Bruno Decl. at ¶¶ 8-10; Dunlap Decl. at ¶¶ 4, 7-9; Griffin Decl. at ¶¶ 4-6; Shoman Decl. at ¶ 7; Tomlinson Decl. at ¶¶ 6; Clayton Decl. at ¶¶ 6, 9-10. Many of those communities are isolated, rural, lack reliable broadband and cell phone service, and/or are prone, or especially vulnerable, to severe weather, natural disasters, and man-made disasters, making the functionality of these sub-awardees vital for public safety. Anderson Decl. at ¶¶ 4-7; Black Decl. at ¶¶ 7-10, 13 (describing the ice storms, hail storms, tornadoes, and flooding that cause frequent power outages that can last up to a week); Bruno Decl. at ¶¶ 5-8 (describing the

factors that yield multiple power outages per month); Dahl Decl. at ¶¶ 4-6; Dunlap Dec. at ¶¶ 5-10 (describing the hurricanes and tropical storms experienced by the region, along with man-made hazards such as large petrochemical plants); Griffin Decl. at ¶¶ 4-5; Prasuhn Decl. at ¶¶ 5-10 (describing the sparsely populated region, a quarter of the population of which lacks broadband internet connectivity, and in which cell phone service is unreliable or non-existent); Shoman Decl. at ¶¶ 5, 12-15 (describing frequent power outages and disasters such as avalanches, landslides, and glacier outbursts); Tomlinson Decl. at ¶¶ 4-6 (noting that over a quarter of the region lacks access to high quality internet service); Yoder Decl. at ¶¶ 5-13 (describing its service region as prone to wildfires and severe winter storms that disrupt power for extended periods of time, many of the inhabitants of which lack cell phones or cell phone service and therefore rely on radio for news and information); Clayton Decl. at ¶¶ 4-11, 28 (describing rural region prone to natural disasters, poor internet coverage).

Further, CPB has nine employees who are wholly or partly funded through the NGWS Grant, as well as a consulting firm. Mintz Decl. at ¶¶ 78. Normally, CPB pays their salaries and benefits and the consulting fees, and then seeks reimbursement through PARS. *Id.*

In addition, FEMA's conduct has already begun to undermine the goodwill and reputation that CPB has with the American public and, in particular, with its industry partners and sub-awardees. Mintz Decl. at ¶¶ 1, 27-28, 34, 39. CPB is the steward of the federal government's investment in public broadcasting and the largest single source of funding for public radio, television, and related online and mobile services. *Id.* As a result, CPB developed a strong reputation and trust with public radio and television stations. *Id.* However, in light of FEMA placing the reimbursements "on hold" and the harm to CPB and the sub-awardees, including by having the sub-awardees incur expenses to third-party vendors without the ability to receive

reimbursement through CPB for the work mandated under the NGWS Grant, CPB, on February 19, 2025, issued a Notice of Stop Work to all 42 sub-awardees. *Id.* The Notice alerted them to the fact that CPB does not have access to the NGWS Grant funding. *Id.*

Now that this same thing has happened a second time in three months, multiple stations and business partners have indicated their lack of confidence in both CPB's stewardship of the NWGS Grant program and the likelihood of reimbursement. Slavitt Decl. at ¶¶ 57-61; Black Decl. at ¶¶ 24-26; Yoder Decl. at ¶ 34. Even with the reimbursement portal currently open, because of that lack of confidence and trust, these sub-awardee partner stations are reluctant to move forward with NGWS upgrades without assurances that the portal will remain open, for fear that it could be shut down again without notice. *Id.*; Anderson Decl. at ¶ 27; Bruno Decl. at ¶ 30; Dahl Decl. at ¶ 16; Dunlap Decl. at ¶ 29; Griffin Decl. at ¶ 21; Prasuhn Decl. at ¶ 24; Shoman Decl. at ¶ 30; Tomlinson Decl. at ¶ 27; Clayton Decl. at ¶ 27. Unless remedied with an instruction to keep the portal open, this fear caused by FEMA's arbitrary actions, further hinders the possibility of completing the NGWS upgrades by the NGWS grant deadline and puts the entire program at risk of collapse. Mintz Decl. at ¶¶ 61, 63-64, 70, 72-75; Slavitt Decl. at ¶¶45-46, 49-50.

## **STANDARD OF REVIEW**

The "underlying purpose" of preliminary injunctive relief is "preserving the status quo and preventing irreparable harm" until the Court has an opportunity to rule on the merits. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974) (noting this with respect to temporary restraining orders). *See also Chaplaincy of Full Gospel Churches v. England,* 454 F. 3d 290, 297 (D.C. Cir. 2006) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.") (citations omitted).

To obtain a preliminary injunction, the moving party must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy,* 454 F.3d at 297. "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## ARGUMENT

### I.    CPB Is Likely To Succeed On The Merits Of Its Claim

CPB has brought its claim under the APA, which entitles "a person suffering legal wrong because of any agency action" to seek "judicial review thereof." 5 U.S.C. § 702. "The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). More specifically, and relevant to the claims in the current matter, the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be: [1] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or 2] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(A), (C).

CPB is likely to succeed on the merits of its claim because FEMA's conduct in toggling on and off the PARS portal without notice and without explanation, while reserving the right to continue toggling it off and on in the future without notice, is (1) the epitome of arbitrary and capricious, and (2) is contrary to law, in excess of statutory authority, and *ultra vires*.

a.    *FEMA's Closure of the PARS Portal Is Arbitrary And Capricious*

FEMA's decisions to repeatedly close the PARS portal are arbitrary and capricious because, before taking these actions, FEMA failed to articulate any reasonable basis—indeed, any basis at all—for preventing CPB from making requests for reimbursement under the 2022 NGWS Grant. Indeed, even post-action (which normally cannot be taken into account under the APA), FEMA has articulated no cogent reason for its actions at all other than having its counsel read a statement that FEMA was not restarting the "manual review" process, and that other grant recipients were being paid, but CPB was not. "It is axiomatic that before the Court can review an agency's decision, it must know what the agency decided, and why." *Ludlow v. Mabus,* 793 F. Supp. 2d 352, 354-55 (D.D.C. 2011).

It is "a fundamental requirement of administrative law . . . that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do; an agency's statement must be one of reasoning"). As Judge AliKhan made clear:

> To pass muster, the agency "***must examine the relevant data and articulate a satisfactory explanation for its action***[,] including ***a 'rational connection between the facts found and the choice made***.' Agency action is generally deemed unlawful if it "has relied on factors which Congress has not intended it to consider, ***entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise***.

*National Council of Nonprofits,* 2025 WL 597959 at *14 (emphasis added) ("The touchstone of this inquiry is rationality, and the Defendants' actions flunk that test"). None of that was done by FEMA.

Further, when addressing an existing program, an agency "must assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 30 (internal quotations omitted). "It would be arbitrary and capricious to ignore such matters." *Id.* at 30.

Here, the only "explanation" that FEMA has offered in support of its closure of the portal to CPB is that others are being paid, but CPB is not. This, of course, is no explanation at all and further singles out CPB for adverse treatment with no explanation whatsoever. This is precisely the type of "inscrutable reasoning" that, "given the information available to the agency, [is] facially irrational." *See Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 173 (1st Cir. 2021). *See also AIDS Vaccine Advocacy Coalition*, 2025 WL 752378, at *10 ("Defendants have yet to offer any explanation, let alone one supported by the record, for why a blanket suspension setting off a shockwave and upending reliance interests for thousands of businesses and organizations around the country was a rational precursor to reviewing programs"). "As the court has already noted, agencies can decide to re-evaluate their programs, and they may decide to end agreements or federal awards. ***But those decisions must be made lawfully and in accordance with established procedures and relevant rules and regulations.***" *Climate United Fund v. Citibank, N.A.,* __ F. Supp. 3d __, 2025 WL 1131412, at *16 (D.D.C. April 16, 2025) (emphasis added). Because FEMA has provided no basis for its actions, they are necessarily arbitrary and capricious under the APA.

Further, FEMA has failed to demonstrate any consideration of the reliance interests affected by its actions. Grant recipients rely on the terms of their grant awards in not only purchasing equipment under the grant, but seeking proposals and bids from vendors and planning for the

installation of such equipment, especially when there is no termination for convenience provision. CPB has relied upon the NGWS Grant in both its own operation and its distribution to sub-awardees. *See* Mintz Decl. at ¶¶ 23-24, 26, 66, 77. Those sub-awardees have also relied upon the NGWS Grant in funding their technology and equipment improvement operations. *Id. See also* Gavin Decl. at ¶¶ 35-36; Bruno Decl. at ¶¶ 16, 19-27; Anderson Decl. at ¶¶ 17-19, 26; Tomlinson Decl. at ¶¶ 13, 20, 24; Yoder Decl. at ¶¶ 23-26, 29; Black Decl. at ¶¶ 22-26; Dunlap Decl. at ¶¶ 19-21, 26, 28; Griffin Decl. at ¶¶ 9-16, 18; Dahl Decl. at ¶¶ 11-13; Shoman Decl. at ¶¶ 20-23; Prasuhn Decl. at ¶ 21; Clayton Decl. at ¶¶ 18-20.

FEMA gave no indication that it considered these substantial reliance interests, much less that it meaningfully weighed these interests in reaching its conclusion to close the PARS Portal yet again, shutting off all ability to even request NGWS Grant funds for a second time. *See AIDS Vaccine Advocacy Coalition*, 2025 WL 752378, *10 (D.C. March 10, 2025) ("nothing in the record suggested that Defendants considered and had a rational reason for disregarding the massive reliance interests of businesses and organizations"); *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (finding that a freeze on federal funds implicates reliance interests that "are all too real"); *Massachusetts v. Nat'l Institutes of Health*, No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) (issuing a preliminary injunction enjoining freeze of funding where agencies did not consider the substantial reliance interests). Because Defendants "should have considered th[ese] matters but did not," their "failure was arbitrary and capricious in violation of the APA." *See Regents*, 591 U.S. at 33.

     b.     *FEMA's Closure of the PARS Portal Is Contrary To Law, In Excess Of Statutory Authority, And Ultra Vires*

As a threshold matter, at the various points when FEMA closed the PARS portal freezing CPB out of access to Congressionally appropriated funding, FEMA was subject to numerous

injunctions prohibiting it "from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13. . . ." *National Council of Nonprofits,* 2025 WL 597959 at *19-20. *See also Trump,* 74 F. Supp.3d at 53. Those injunctions also ordered FEMA and other government agencies to "continue releasing any disbursements on open awards that were paused due to OMB Memorandum M-25-13." *National Council of Nonprofits,* 2025 WL 597959 at *19-20. *See also Trump,* 74 F. Supp.3d at 53. Indeed, FEMA, in ending its "manual review" and re-opening the PARS portal the first time, recognized that those orders required it to discontinue its manual review and allow processing of expense reimbursements as it did prior to February 2025. Decl. of E. Slavitt at ¶ 24, Ex. F. Notwithstanding that recognition, FEMA then closed the PARS portal again without notice or explanation on May 13, 2025.

In addition to FEMA's conduct violating federal injunctions, it also violates the controlling law. Specifically, pursuant to federal regulations, FEMA "***must*** provide written notice of termination to the recipient or subrecipient. The written notice of termination should include the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341 (emphasis added). FEMA has provided no such notice of any termination of the NGWS Grant. *See* Mintz Decl. at ¶¶ 28, 31-32, Exhibit G. Absent notice of termination or circumstances that do not exist here, "[p]ayments for allowable costs ***must not be withheld*** . . . ." *See* 2 C.F.R. § 200.305 (emphasis added). CPB and its sub-awardees have fully complied with the terms and conditions of the NGWS Grant and FEMA has no basis to refuse to allow submissions for reimbursement, let alone withhold payments. Mintz Decl. at ¶¶ 28, 31-32.

In addition, the NGWS Grant provides that, if there is any purported non-compliance by CPB, FEMA may proceed with a Remedy Notification, and that "[a]ny action to terminate based

on noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-200.342 as well as the requirement of 2 C.F.R. § 200.340(c) . . . ."  Mintz Decl. at Exhibit A.  CPB has kept FEMA fully informed of the status of the subawards and has complied with all obligations.  FEMA has not issued CPB or any sub-awardee a Compliance Notification or a Remedy Notification.  FEMA has not otherwise advised or expressed that CPB has done anything noncompliant in its administration of the NGWS Grant.  In fact, CPB has been compliant in its administration of the grant and has acted under FEMA's close supervision for years.  CPB has received no communication from FEMA that the status of the grant has changed, or could change anytime soon.  *See* Mintz Decl. at ¶¶ 25, 28, 31-32, Exhibit G.

The Uniform Guidance and the NOFO set forth the specific procedures by which FEMA may terminate a grant, both of which require written notice of termination, written notice of a compliance failure, or written notice of a required remedy.  FEMA has issued no such notices either time that it unilaterally closed the PARS portal.  Therefore, FEMA's pattern of toggling on and off access to PARS without notice and explanation is in clear violation of the law.  *See Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic . . . that an agency is bound by its own regulations.") (internal quotation marks and citation omitted).  *See Nat'l Institutes of Health*, Case No. 1:25-cv-10388, Dkt. No. 105 at 19-20 (finding failure to comply with regulations on freezing grant funding violated APA).

Finally, FEMA's actions are transparently retaliation for 1) CPB's refusal to dismiss this lawsuit immediately after FEMA reopened PARS, 2) CPB's lawsuit filed against the President seeking to nullify the removal of members of its Board of Directors, or 3) both.  As stated above, FEMA has refused to provide any reason for its closure of the PARS system and has explicitly told

CPB's counsel that CPB is the only grant recipient receiving this treatment.  Lipchitz Decl. at ¶¶ 16-21, 24.

Judge Cooper recently granted a preliminary injunction against the Department of Justice in similar circumstances, finding the DOJ had retaliated against the American Bar Association by terminating agreements in violation of the ABA's First Amendment rights.  *Am. Bar Ass'n v. U.S. Dep't of Justice*, Case No. 25-cv-1263, 2025 WL 138891 (D.D.C. May 14, 2025).  *See also S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 521 n.15 (D.C. Cir. 1977) ("While our disposition of this case is such that we need not address either of these issues, we do express concern at evidence in the record that indicates at least the possibility that SMHA's social activism, particularly labor organizing, contributed to the ultimate adverse decision under scrutiny here.") (internal citations omitted).  So too here.  FEMA's actions were clearly retaliatory for CPB's refusal to simply dismiss its claims, CPB's actions in defending its private entity status against Presidential intervention, or both.  As a result, FEMA has violated CPB's First Amendment rights, which protect CPB's ability to petition the Courts for redress against government overreach.  *See, e.g., NAACP v. Button,* 371 US 415, 429 (1963) ("[T]he First Amendment . . . protects vigorous advocacy, certainly of lawful ends, against government intrusion . . . . ").  This violation of the First Amendment is an independent basis to find that FEMA has acted contrary to law in violation of the APA.

## II.    CPB, its Sub-Awardees, And The Public Will be Irreparably Harmed Without a Preliminary Injunction

FEMA's conduct in repeatedly freezing the reimbursement mechanism under the NGWS Grant has caused CPB, its sub-awardees, and the public at large irreparable harm.  "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009).  "It is settled beyond peradventure that irreparable harm can consist of 'a substantial injury that is not accurately

measurable or adequately compensable by money damages.'" *Nat'l Institutes of Health*, 2025 WL 702163, *28 (D. Mass. March 6, 2025) (granting injunctive relief against agencies' freezing of funds for issued grants); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). As the U.S. District Court of Rhode Island recently recognized in issuing an injunction against numerous agencies, including FEMA, for freezing funding for pre-existing grants and contracts:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (***particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended***. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

*Trump*, 2025 WL 715621 at *13 (emphasis added).

Moreover, when an agency's shifting conduct creates instability that impairs or makes it more difficult to accomplish the plaintiff's primary mission, that constitutes irreparable injury warranting injunctive relief. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("obstacles [that] unquestionably make it more difficult for [a plaintiff] to accomplish [its] primary mission … provide[s] injury for purposes [of] … irreparable harm"); *Learning Resources, Inc. v. Trump*, 2025 WL 1525376, at *14 (D. D.C. May 29, 2025) (granting preliminary injunction due to government's ever-changing tariff rates created "instability and unpredictability" massively disrupting plaintiff's supply chain, business relations, and business operations); *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 178 (D. D.C. 2017) (irreparable harm where agency's arbitrary delays threatened to "frustrate[ ]" organization's mission by obstructing organization's engagement with industry partners and developers to encourage the acquisition and construction of housing that is affordable to voucher holders).

Here, the irreparable harm caused by FEMA's conduct is multi-fold.

*a.    FEMA's Actions Have Frustrated CPB's Mission To Effectuate the NGWS Grants*

FEMA has frustrated CPB's ability to accomplish its primary purpose to ensure the proper procurement of, and payment for, critical infrastructure for the national emergency alert system under the NGWS Grants. This Court recognized this frustration of purpose at the hearing on CPB's Motion for a Temporary Restraining Order, stating: "To be sure, CPB's inability to access the funds made available under the NGWS grant somewhat frustrates its 'mission' of 'updating and enhancing the country's public emergency alert apparatus . . . a mission it carries out by, 'supporting investments to improve the resilience and security of public broadcasting networks and systems." March 17, 2025 Hearing Tr. At 9:5-11 (Dkt No. 17). As a matter of law, "obstacles [that] unquestionably make it more difficult for [a plaintiff] to accomplish [its] primary mission … provide[s] injury for purposes [of] … irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). *See also Nat'l Institutes of Health*, 2025 WL 702163 at *30 ("For essentially all of the Plaintiff institutions, there are myriad other immediate consequences that will make it harder to fulfill their purpose…. These consequences include the degradation of vital infrastructure, the loss of imperative staff necessary for research to be conducted, … and finally, the uncertainty around the ability to sustain future grant applications, resulting in the loss of direct research").

While the Court ruled at that hearing that CPB had not demonstrated irreparable harm, it did so on the basis that CPB had not demonstrated that the harm could not "be remediated later absent a TRO. That is, CPB has not shown that it must access the NGWS Grant funds and reimburse its sub-awardees now or else it simply can no longer accomplish those objectives." 3/17/25 Tr. At 9:13-17. But this is ***precisely*** the situation CPB now faces. The NGWS Grant expires in September 2025. Slavitt Decl. at ¶ 2. Only approximately 10% of the NGWS Grant

has been implemented to date, with extensive work that needs to be completed before September 2025.[4] Slavitt Decl. at ¶¶ 11, 39. In order to secure the proper parts and the proper assistance in installation of those parts, the sub-awardees must order and pay for the parts and services in time to submit those reimbursement requests to CPB, and subsequently CPB to FEMA, before the NGWS Grant expires in September 2025. *See, e.g.,* Shoman Decl. at ¶¶ 23-25; Gavin Decl. at ¶¶ 24-26; Black Decl. at ¶ 27; Prasuhn Decl. at ¶¶ 21-23; Tomlinson Decl. at ¶¶ 22-25; Bruno Decl. at ¶¶ 21-23; Dahl Decl. at ¶¶ 14-15; Anderson Decl. at ¶¶ 23-24; Dunlap Decl. at ¶¶ 26-27; Griffin Decl. at ¶ 16. If FEMA does not reopen the PARS portal in time, and does not keep the portal open, for these actions to be taken, then they cannot be taken.

Obviously, no business is willing to incur significant new expenses if FEMA is constantly changing its position on whether it will allow CPB to submit NGWS expenses for reimbursement. CPB and the NGWS sub-awardees need stability and predictability in planning for and soliciting bids for equipment and installation services such that they can be procured and paid for before the expiration of the grant in September 2025. The chaos created by FEMA is further complicated by the fact that many stations are limited in their ability to perform work by either geography— stations in Alaska can only perform this type of work in the summer months—or the availability of the skilled workers needed to install the equipment. *See* Shoman Decl. at ¶¶ 23-25; Gavin Decl. at ¶¶ 24-26; Black Decl. at ¶ 27; Prasuhn Decl. at ¶¶ 21-23; Tomlinson Decl. at ¶¶ 22-25; Bruno Decl. at ¶¶ 21-23; Dahl Decl. at ¶¶ 14-15; Anderson Decl. at ¶¶ 23-24; Yoder Decl. at ¶¶ 26-30; Clayton Decl. at ¶¶ 22-23. Given FEMA's four-month pattern of arbitrary conduct and its refusal

---

[4] In denying CPB's motion for a TRO, the Court was under the ***incorrect*** belief that all work under the 2022 NGWS Grant had been completed and that all equipment had been purchased and installed such that CPB was only trying to seek reimbursement for work already performed. *See See* 3/17/25 Tr. at 10:18-22 ("In short, CPB has …. not shown that reimbursing its sub-awardees for improvements they made to their emergency alert systems is a matter of 'now or never.'").

to commit to maintaining access to the PARS portal or give sufficient notice and an explanation before shutting off access in the future, NGWS sub-awardees are not willing to incur new liabilities in the unpredictable and chaotic environment created by FEMA.

As Judge Contreras recently recognized in a similar context:

How could Plaintiffs possibly describe the exact costs they will face from paying tariffs that the President imposes, pauses, adjusts, and reimposes at will? *The instability and unpredictability of the changing tariff rates cause massive disruptions in [plaintiffs'] supply chain, business relationships, and business operations.* Without preliminary relief, Plaintiffs will be subjected to ongoing supply chain chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to be paid for incorrect logistical judgments.

*Learning Resources, Inc.*, 2025 WL 1525376, *14 (emphasis added) (citations and quotations omitted).  *See also Open Communities All.*, 286 F. Supp. 3d at 178 (irreparable harm where agency's arbitrary delays "frustrates OCA's engagement with developers to encourage the acquisition and construction of housing that is affordable to voucher holders"); *Nalco Co.*, 786 F. Supp. 2d at 188 (finding irreparable harm where plaintiff will "suffer the loss of long-standing clients that may be unwilling, or unable to do business with Nalco hereafter if no injunction is issued").  If FEMA is allowed to run out the clock on the 2022 NGWS Grant, then there can be no remediation of the harm being caused and no "do-over."  *See also Brennan Center for Justice at NYU School of Law v. Dep't of Commerce*, 498 F. Supp. 3d 87, 101 (D.D.C. 2020) ("the harm would be beyond remediation because under current law the census and the reapportionment process—and the opportunity for the public to be informed about them while they are ongoing— would be over.") (Kelly, J.).

Here, FEMA's conduct not only frustrates the entire purpose of the 2022 NGWS Grant, but similar grants for 2023 and 2024.  Mintz Decl. at ¶¶ 65.  Of course, it also frustrates CPB's Congressionally-mandated purpose of: (i) "mak[ing] public telecommunications services available

to all citizens of the United States;" (ii) ensuring that "all citizens of the United States have access to public telecommunications services through all appropriate available telecommunications distribution technologies." *See* 47 U.S.C. § 396. Given the comprehensive declarations, FEMA's well-established conduct, and the expiring term of the 2022 NGWS Grant, FEMA has unquestionably made it more difficult for CPB to accomplish its primary mission. *See Open Communities All.*, 286 F. Supp. 3d at 178 ("the actions taken by the defendant have perceptibly impaired the organization's programs").

        b.      *FEMA's Actions Endanger Citizens*

FEMA's conduct also creates a risk of irreparable harm by endangering the safety and lives of citizens who rely on the emergency alert system. FEMA and DHS have repeatedly publicly conceded that effective and timely "[e]mergency communications are critical to the Nation's ability to respond to devastating natural disasters, terrorist threats, and other emergency events, incidents, and routine activities affecting our communities every day" and indeed, the communications are "life-saving." *See* Mintz Decl. at ¶ 8; *see also* Siefert Decl. at ¶5. The *Trump* Court noted that this is ***precisely*** the type of harm which is irreparable:

> In an evident and acute harm, with floods and fires wreaking havoc across the country, federal funding for emergency management and preparedness would be impacted. To be sure "[i]f a major disaster were to occur while federal emergency management funds ... are frozen ... [p]ending preparedness training and mitigation work may come to a stop and the incapacitation of federally-funded emergency management programs and services that would result from a federal funding freeze could very well lead to increased loss of life and injury

*Trump*, 2025 WL 715621, at *14.

FEMA's conduct has resulted in the standstill not only of the work needed to be performed under the 2022 NGWS Grant, but also the planning, coordination and work under the 2023 and 2024 grants. In short, the entire Congressionally-mandated NGWS program has stalled, leaving

the existing aging infrastructure at serious risk of failure. *See Nat'l Institutes of Health*, 2025 WL 702163 at *30 (recognizing that negative impact on public health and safety, "the degradation of infrastructure" constituted irreparable harm favoring the issuance of injunctive relief).

      *c.*    *FEMA's Actions Have Harmed, and Continue to Harm, CPB's Goodwill*

For its entire existence CPB has been the steward of administering and ensuring the prompt payment of Congressionally appropriated funds to public broadcast stations.  During that time, CPB has never had to issue a single stop work order to stations or to other grantees.  But now it has had to issue two in short succession, causing its business and grant partners to lose faith in CPB's ability to administer the funds Congress has mandated it to manage. CPB has received multiple letters from its partners noting their lack of confidence, and individual stations have little faith in the NGWS Grant's viability.  *See* Slavitt Decl. at ¶¶ 54-58; Mintz Decl. at ¶¶ 71, 74-75; Yoder Decl. at ¶ 34; Black Decl. at ¶¶ 24-26.

CPB's funding is essential for the operation of the public broadcast sector, and stations depend upon and expect CPB to operate in a reliable and predictable fashion.  As a result of the position in which FEMA has placed CPB, many stations and the public at large are greatly concerned about CPB's ability to reimburse the sub-awardees.  Mintz Decl. at ¶¶71-75, Exhibit H. The loss and damage to CPB's reputation and goodwill are another form of irreparable harm.  *See id.* at ¶39; *AIDS Vaccine Advocacy Coalition*, 2025 WL 752378, *19, fn. 19 (finding funding freeze damaged goodwill and reputation where plaintiffs had to "violate contractual duties by deferring payments to suppliers…,[there were] disruptions to relationships with longstanding partners whose trust had been cultivated over decades…and having to go back on previous assurances made to clients and partners in reliance on the agreements that have now been canceled"); *Nat'l Institutes of Health*, 2025 WL 702163 at *31 (finding reputational harm caused by funding freeze

undermined trust in plaintiffs who had to cut back or discontinue programs or clinical trials); *TikTok Inc. v. Trump,* 490 F. Supp. 3d 73, 84 (D.D.C. 2020) ("Plaintiffs have also proffered evidence that they have been harmed, and will continue to be harmed, by the erosion of TikTok's attractiveness as a commercial partner."); *Nalco Co. v. EPA*, 786 F. Supp. 2d at 188 (finding EPA's action resulted in erosion of goodwill given the existence of "long-standing clients that may be unwilling or unable to do business with Nalco"); *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.,* 963 F. Supp. 1, 5 (D.D.C. 1997) (holding that damage to reputation and goodwill with partners in the industry was an irreparable harm).

### III.    The Public Interest and the Balance of Equities Favor The Entry of A Preliminary Injunction

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance*, 286 F. Supp. 3d at 179.  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted).  As the U.S. District Court for the District of Rhode Island recognized in issuing a preliminary injunction on OMB's funding freeze of appropriated funding for numerous states and nonprofits:

> The Defendants are not harmed where the order requires them to disburse funds that Congress has appropriated to the States and that they have obligated. The Court's order … enjoins agency action that violates statutory appropriations and obligations.  An agency is not harmed by an order prohibiting it from violating the law.
>
> On the other hand, without injunctive relief to pause the categorical freeze, the funding that the States are due and owed creates an indefinite limbo. Without the

injunction, Congressional control of spending will have been usurped by the Executive without constitutional or statutory authority.

*Trump*, 2025 WL 715621 at *16. *See also Nat'l Council of Nonprofits*, 2025 WL 597959 at *19 ("Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated, Plaintiffs have more than met their burden here").

Here, Congress, in creating the CPB, expressly recognized the public interest in:

- Having the Federal government "complement, assist, and support a national policy that will most effectively make public telecommunications services available to all citizens of the United States;" 47 U.S.C. § 396(a)(7);

- "[P]ublic television and radio stations and public telecommunications services, [as they] constitute valuable local community resources for utilizing electronic media to address national concerns"; 47 U.S.C. § 396(a)(8); and

- Having "the Federal Government [] ensure that all citizens of the United States have access to public telecommunications services through all appropriate available telecommunications distribution technologies[.]" 47 U.S.C. § 396(a)(9).

DHS and FEMA's award of the NGWS Grant to CPB was in furtherance of these well-established public interests set by Congress. Further, the grant promoted public health and safety by ensuring the modernization and technological improvement of the emergency alert system, which FEMA concedes provides ***critical*** emergency and life-saving information to the public. *See,* Mintz Decl. at ¶¶ 2, 4, 8, 11. "Courts have consistently held there is a strong public interest in health and safety." *Nat'l Institutes of Health*, 2025 WL 702163 at *32 (finding funding freeze jeopardized public health and safety); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (writing that public health is a "significant public interest"). Moreover, there is "substantial public interest in having governmental agencies abide by the federal laws." *Nat'l Institutes of Health*, 2025 WL 702163 at *32; *Newby*, 838 F.3d at 12 (D.C. Cir. 2016).

In comparison with the lack of harm to FEMA, absent injunctive relief, CPB's harm is substantial and ranges from: (i) the halting of the critical and essential work of improving the

national emergency alert system that exists to provide life-saving alerts to those facing imminent danger; (ii) the further degradation of infrastructure that the government itself has repeatedly recognized is "critical" and an "essential part of America's emergency preparedness"; (iii) the loss of employees who are central to not only the 2022 NGWS Grant, but similar grants awarded in 2023 and 2024; (iv) the millions of dollars incurred by CPB and its sub-awardees which cannot be paid with appropriated funds other than those earmarked for the NGWS Grant, thereby leaving CPB and its sub-awardees without a legal remedy; and (v) the impairment of CPB's goodwill and reputation as the responsible steward of the federal government's investment in public broadcasting and the largest single source of funding for public radio, television, and related online and mobile services. *See Nat'l Institutes of Health*, 2025 WL 702163 at *30 (recognizing that negative impact on public health and safety, "the degradation of infrastructure, the loss of staff [and the]… delay and potential suspension of future grant applications" all constituted irreparable harm favoring the issuance of injunctive relief); *Nat'l Council of Nonprofits*, 2025 WL 597959, *19 (among the harm recognized by the Court included that: "Entire funding portals were taken offline with no rhyme or reason, generating significant confusion and fear.").

   As a result, both the public interest and the balance of harms favors the issuance of a preliminary injunction, enjoining the continued arbitrary closing of the PARS portal without notice and explanation.

**IV.**    **The Court Should Impose No Bond Requirement on CPB**

   Rule 65(c) vests district courts with broad discretion "to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Nat'l Council of Nonprofits*, 2025 WL 597959 at *19). *See also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,* 2025 WL 573764, *29 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars).

A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat'l Council of Nonprofits*, 2025 WL at *19; *Nat'l Ass'n of Diversity Officers*, 2025 WL at *29; *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases)

As this Court has recognized in requiring no bond to be posted in *Nat'l Council of Nonprofits* when faced with a similar situation where an executive agency had arbitrarily and unlawfully "frozen" or withheld funds appropriated by Congress:

> ***In a case where the government is alleged to have unlawfully withheld trillions of dollars of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm***. That is especially so when Defendants—OMB and its director—will personally face no monetary injury from the injunction.

*Nat'l Council of Nonprofits*, 2025 WL at *19 (emphasis added). This conclusion is equally true in this case, particularly where the only purported "harm" to FEMA if an injunction is determined to be improperly granted is that it has to process expense reimbursement requests for the procurement of essential equipment to advance that national emergency alert system, which FEMA itself recognized was "critical."

## **CONCLUSION**

For the foregoing reasons, Plaintiff the Corporation for Public Broadcasting requests that the Court enter a preliminary injunction:

- directing FEMA to maintain CPB's access to FEMA's Payment and Reporting System ("PARS") so that reimbursement requests can be submitted by CPB;

- directing FEMA to process those submitting reimbursement requests according to applicable law, regulation, and the terms of the NWGS Grant.

- directing FEMA if it wishes to close access to the CPB portal in the future, it must provide 30-days advance notice and a written explanation as to why it intends to prevent access to PARS.

Respectfully submitted,

By:  */s/ Jason W. McElroy*
Jason W. McElroy (D.C. Bar No. 502733)
Peter C. Nanov (D.C. Bar No. 230021)
SAUL EWING LLP
1919 Pennsylvania Avenue NW, Suite 550
Washington, D.C. 20006
Tel: (202) 295-6605
jason.mcelroy@saul.com
peter.nanov@saul.com

Jeffrey S. Robbins (*Admitted Pro Hac Vice*)
Joseph D. Lipchitz (*Admitted Pro Hac Vice*)
SAUL EWING LLP
131 Dartmouth St., Suite 501
Boston, MA 02116
Tel:  (617) 912-0941
Email: jeffrey.robbins@saul.com
        joseph.lipchitz@saul.com

**Counsel for The Corporation for Public Broadcasting**

Date:   June 12, 2025