**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CORPORATION FOR PUBLIC BROAD-CASTING,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, et al.,<br><br>*Defendants*. | Civil Action No. 25-740 (TJK) |

## MEMORANDUM OPINION

Public broadcasting stations help inform the public of impending disasters by disseminating emergency alerts. To assist these stations—especially those in remote areas of the country—update their aging equipment, the Federal Emergency Management Agency chose the Corporation for Public Broadcasting to administer the Next Generation Warning System Grant Program. CPB issues sub-awards to broadcasting stations, who buy and install new equipment and then seek reimbursement from CPB. CPB, in turn, draws funds from FEMA through a payment portal called PARS. In February 2025, FEMA abruptly closed that portal and, for many weeks, either did not process CPB's reimbursement requests or significantly delayed releasing those funds. That effectively brought the grant program to a standstill; CPB's sub-awardees sat on unreimbursed costs and uninstalled equipment. So in March 2025, CPB sued. When the portal reopened but then shut down again in May, CPB signaled it would seek a preliminary injunction. But then in early June, FEMA again restored CPB's access to PARS, and it remains open today. Even though CPB can now draw funds from PARS for the grant program, it moves for a preliminary injunction requiring FEMA to keep the portal open. But the status quo—an open portal—largely dooms CPB's motion

because it cannot show that it will likely suffer irreparable harm without the preliminary injunction it seeks.  So the Court will deny the motion.

## I.    Background

### A.    FEMA's National Emergency Alerting System and Grant Program

The government maintains a national emergency alerting system created in 2006, which allows the President as well as federal, state, and local authorities to send emergency alerts.  *See* E.O. 13407, 71 Fed. Reg. 36975 (June 26, 2006).  The Integrated Public Alert & Warning System ("IPAWS") is managed by the Federal Emergency Management Agency ("FEMA") and "serves as a gateway between" alerting authorities and "national communications networks"—think radio, television, and cell phone networks.  *The Integrated Public Alert and Warning System (IPAWS): Primer and Issues for Congress*, Congressional Research Services 1–2, (Mar. 5, 2025).[1]  Using "specialized software," authorities submit a message to IPAWS, which then "validates" and "broadcasts" the alert to relevant communities "by using public broadcasting equipment."  ECF No. 1 ("Compl.") ¶¶ 12–13.  Public broadcasting stations "reach 99% of the American population," and in many parts of the country, particularly rural communities, they "are the only local media."  ECF No. 32 ("Mintz Decl.") ¶ 2.

The Corporation for Public Broadcasting ("CPB") is a congressionally authorized non-profit corporation and "the steward of the federal government's investment in public broadcasting."  Mintz Decl. ¶ 1; *see* Public Broadcasting Act of 1967, 47 U.S.C. § 396.  It is "the largest single source of funding" for public radio, television, and other networks, and most of its allocated budget "goes directly to more than 1,500 public media stations across the country."  Mintz Decl. ¶¶ 1–2.  Apart from distributing congressionally appropriated funds, CPB administers "two sets of

---

[1] *See* https://www.congress.gov/crs_external_products/R/PDF/R48363/R48363.4.pdf.

federal grants," including the Next Generation Warning System ("NGWS") grant program. *Id.* ¶¶ 2, 9.

The NGWS grant program is a 36-month program authorized by Congress that "makes Federal funds available" to allow broadcasting stations "to improve the resilience and security" of their emergency alert systems. Mintz Decl. ¶ 10; ECF No. 31-2 at 26–27. Congress appropriated $40 million to FEMA to implement the NGWS grant in 2022, and FEMA selected CPB to administer that grant by distributing sub-awards to local public broadcasting stations. *See* Pub. L. 117-103, 136 Stat. 328 (Mar. 15, 2022); ECF No. 31-2 at 29; Mintz Decl. ¶¶ 9–15, 21. The "performance period" under the 2022 NGWS grant expires on September 30, 2025. ECF No. 31-2 ("Slavitt Decl.") ¶ 2; ECF No. 32 at 33, 52. FEMA has, however, awarded additional NGWS grants to CPB based on funds Congress appropriated for fiscal years 2023, 2024, and 2025. Mintz Decl. ¶¶ 23, 69; Slavitt Decl. ¶ 1; ECF No. 34-1 ("Supp. Slavitt Decl.") ¶ 8.

FEMA makes those grants on a "cost reimbursement basis," meaning "CPB accrues liabilities" for the costs of hiring staff dedicated to the program and "for costs incurred or expenditures made by the sub-awardees." Slavitt Decl. ¶ 4. Specifically, CPB issues sub-awards to public broadcasting stations who buy the "necessary equipment to enhance their" emergency alert systems and then "submit reimbursement requests to CPB." *Id.*; Mintz Decl. ¶¶ 24, 60. Sub-awardees are "not required to match" the award "with any amount of" their own "funds." Mintz Decl. ¶ 25. To "process" the station's reimbursement requests, "CPB accesses FEMA's Payment and Reporting System ("PARS")" and "draw[s] for that reimbursement," usually once a month. *Id.* ¶¶ 18, 29, 31. FEMA, in turn, "typically issues payment to CPB through PARS within two business days." *Id.* ¶ 31. When the 2022 NGWS grant expires on September 30, sub-awardees have 3 months—and CPB has 4—to submit final requests for reimbursement to FEMA. ECF No. 32 at

52.

In awarding the grant, FEMA recognized the importance of "extending the reach and quality of IPAWS alerts." Mintz Decl. ¶ 17; ECF No. 32 at 151. The NGWS program, it explained, would "enable[] broadcasters in rural and underserved communities to acquire . . . potentially life-saving technology when cost concerns might otherwise discourage or delay adoption." ECF No. 32 at 139. Indeed, some equipment currently used by CPB's sub-awardees is "in disrepair," "ineligible for maintenance," and "at the end of its life." *E.g.*, ECF No. 31-4 ¶¶ 10–11 (describing 20-year-old transmitter); ECF No. 31-8 ¶ 13 (describing 23-year-old transmitter); ECF No. 31-12 ¶ 16–17 (describing 50-year-old generator). If those critical components were to "fail," some stations could no longer "broadcast emergency alerts." *E.g.*, ECF No. 31-8 ¶ 15; ECF No. 31-11 ¶ 19; ECF No. 31-12 ¶ 32.

For instance, one radio station serving rural parts of Indiana, Illinois, and Kentucky—areas prone to severe weather—"constantly faces the possibility of being permanently off the air" because it relies on a transmitter that is "15 years old and already failing to broadcast at optimal power." ECF No. 31-5 ¶¶ 5–17. Like many other stations, it is "unable" to buy a new transmitter "without the NGWS grant funds." *Id.* ¶ 22. Another station serving mountainous parts of New York and Pennsylvania is "often the only source of real-time emergency information" in the region and uses a 15-year-old transmitter that could fail "[a]t any time." ECF No. 31-6 ¶¶ 5–12. The station has a backup battery that could last two hours; once that time runs out, so does the station's ability to broadcast emergency alerts. *Id.* ¶ 15. Pleas to "local and state governments for funding assistance" have gone unanswered. *Id.* ¶ 16. So the equipment these stations seek to replace using the NGWS grant is important to their ongoing ability to continue issuing emergency alerts. Still, according to CPB, "the majority of work under the 2022 NGWS Grant has yet to be completed."

Slavitt Decl. ¶ 9.  To date, CPB has "drawn down" only about $4 million of the appropriated $40 million.  ECF No. 34-3 at 10.

### B.    FEMA's Challenged Actions and This Lawsuit

On February 19, 2025, CPB accessed PARS to submit a reimbursement request.  Slavitt Decl. ¶ 13.  But PARS said the funds were on "hold."  *Id.*; *see* ECF No. 32 at 251–54.  So CPB could not request any reimbursement, "leaving public media stations across the country with hundreds of thousands of dollars of unreimbursed expenses."  Mintz Decl. ¶ 33.  The same day, CPB issued a Notice of Stop Work—the first of its kind—explaining that it could not access the grant funds and was "seeking clarification" from FEMA "on this situation" and directing all sub-awardees "to pause any further commitment of funds."  ECF No. 32 at 256; Mintz Decl. ¶ 35.  CPB sent a formal letter to FEMA demanding that access to the funding be restored but got no response.  Mintz Decl. ¶¶ 36–37.  About a week later, FEMA notified all its grant recipients via email that the agency was "taking swift action to ensure the alignment of its programs with Secretary Noem's direction" and, to that end, was "conducting additional reviews of allocations before releasing funds for all grants."  ECF No. 32 at 264; Mintz Decl. ¶ 38.  That "manual review" process could "take up to 30 days," FEMA said.  ECF No. 32 at 264.  It also required grant recipients to provide "additional information" it had never asked for in the past.  Mintz Decl. ¶ 39.  But when CPB tried to comply—because FEMA stated it would not process any requests absent that information—the "hold" on the PARS system meant "no information could actually be entered, much less submitted to FEMA."  *Id.* ¶¶ 39–40.  CPB reached out to its designated FEMA representatives, but no one explained "why the 'hold' was in place" or "how the situation could be resolved."  *Id.* ¶ 40.

So, on March 13, CPB sued FEMA and one of its administrators, arguing that FEMA's decision to place a "hold" in the PARS portal and preventing CPB from submitting reimbursement

requests was arbitrary and capricious and contrary to law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  ECF No. 1 at 21–23.  The same day, CPB moved for a temporary restraining order directing the agency to remove the "hold" and resume processing its reimbursement requests.  ECF No. 4.  On March 17, the Court denied the motion because CPB had not shown that it would suffer any irreparable harm, much less irreparable harm that would occur so soon that a temporary restraining order was necessary to remedy it.  ECF No. 17.

A few days later, FEMA "provide[d] an alternative submission platform, in the form of the [non-disaster] Grants Portal," though it did not then restore CPB's access to the PARS system.  Mintz Decl. ¶ 42.  That portal, however, allowed only "a single expense submission to be processed at any given time," which caused "significant[] delay[]" on CPB's end given the number of "expenses" it incurs "each month."  *Id.* ¶ 43 (emphasis omitted).

FEMA's "manual review" process remained intact.  So CPB again reached out to ask "what specific additional information" the agency needed "to process NGWS expenses" but received nothing "substantive[]" in response.  Slavitt Decl. ¶ 18.  Instead, on March 19, FEMA issued "generalized 'guidance'" to all grantees explaining that its "additional reviews" would "ensure funds are disbursed appropriately while continuing to support and prioritize communities and disaster survivors."  *Id.*; ECF No. 32 at 269.  More, FEMA also asked grant recipients for "details" on whether their "work or mission involve[d] supporting aliens" and whether "the payment request include[d] an activity involving support to aliens."  ECF No. 32 at 270.  As part of its manual review process, FEMA also "asked for information about CPB's staff costs duplicative of" what CPB had already submitted.  Mintz Decl. ¶ 47.

On April 21, FEMA ended its manual review process.  Citing several orders issued by the district court in *New York v. Trump*, No. 25-cv-39 (D.R.I.), FEMA explained it would, "[e]ffective

immediately," "resume processing grant payment requests and obligations using the same pro-
cesses and procedures it was using prior to the implementation of the manual review process."
Mintz Decl. ¶ 49; ECF No. 32 at 276.[2] "FEMA returned functionality" to the PARS portal the
next day—though not without first being prompted to do so by CPB's counsel—and CPB submit-
ted its reimbursement requests. Mintz Decl. ¶¶ 50–51; Slavitt Decl. ¶ 27. FEMA processed all
requests consistent with its "pre-February protocols" and paid CPB about $1.2 million. Mintz
Decl. ¶ 51. It was the first time in "over two months" that FEMA "prompt[ly] process[ed]" reim-
bursement requests. Slavitt Decl. ¶ 27.

　　The period of normalcy was short-lived. According to CPB, on May 13, "[l]ess than three
weeks after restoring PARS' functionality," FEMA "abruptly" and without explanation "disabled
CPB's ability to submit" reimbursement requests. Mintz Decl. ¶ 52; Slavitt Decl. ¶¶ 32–33. In-
deed, FEMA did so "less than 24 hours" after its counsel "requested that CPB dismiss" this case
because the agency had resumed processing and paying the NGWS grant expenses. Slavitt Decl.
¶¶ 32–33. What happened? FEMA wouldn't say. Id. ¶ 34. Indeed, FEMA's counsel had no
information at all "about what FEMA was doing or why." ECF No. 31-3 ("Lipchitz Decl.") ¶ 22.

---

[2] In that case, several states and the District of Columbia sued President Trump, the Office
of Management and Budget, and several agencies—including FEMA—to challenge the Execu-
tive's decision to temporarily freeze all federal funding programs to review them "for consistency
with current presidential policy." *New York v. Trump*, No. 25-cv-39 (D.R.I. Jan. 28, 2025), ECF
No. 1 at 3. The court temporarily prohibited the defendants from "paus[ing], freez[ing],
imped[ing], block[ing], cancel[ing], or terminat[ing]" disbursement of appropriated federal funds
under awarded grants, executed contracts, or other executed financial obligations. ECF No. 50 at
11. On March 6, the court issued a preliminarily injunction along similar lines. ECF No. 161.
Later that month, the plaintiffs moved to enforce the preliminary injunction, arguing that FEMA's
manual review process violated the court's order by effectively freezing obligated funds. ECF No.
168. The court agreed. "The record ma[de] clear that FEMA's manual review process impose[d]
an indefinite pause on the disbursement of federal funds to the States," it said on April 4. ECF
No. 175 at 14. Thus, the court ordered FEMA to "cease the challenged manual review process."
*Id.*

When the parties spoke again a few days later, counsel informed CPB that "all" he could "say" was "that FEMA [had] not re-started the manual review process, and other grant recipients are now being paid, but CPB is not." *Id.* ¶ 24. So, on May 15, CPB issued another Stop Work Order to all sub-awardees "to prevent further incursion of costs." Supp. Slavitt Decl. ¶ 15.

A few days later, CPB asked the Court to enter a preliminary-injunction briefing schedule. ECF No. 25. But on the eve of the deadline for CPB's motion, FEMA changed course again. That is, on June 5, FEMA's counsel emailed CPB bearing "good news": the agency was "turning the payments back on for CPB," and CPB would "be able to submit its payments by end of day to-morrow," at the latest. ECF No. 31-3 at 92; Lipchitz Decl. ¶ 26. And FEMA indeed reopened the PARS portal on June 6. Mintz Decl. ¶ 61; ECF No. 33-1 ("Breslin Decl.") ¶ 11.[3] But it was not willing to "stipulate" that it would keep the PARS system "'open' to CPB" or give "advance no-tice" of any future portal closure. ECF No. 31-3 at 90–91.

So on June 12, CPB moved for a preliminary injunction requiring FEMA "to keep" the PARS portal "open" and to "provide at least 30 days' notice . . . prior to any future closure." ECF No. 30 at 2; ECF No. 31-20 at 2. The Court held a hearing on June 30, 2025. Then and now, the PARS portal remains open. Mintz Decl. ¶ 61; ECF No. 33-1 ("Breslin Decl.") ¶ 11. And as of June 12, CPB has "withdr[awn] an additional $239,553.77" in reimbursements." Mintz Decl. ¶ 61.

---

[3] FEMA now explains that it temporarily "turned off" CPB's "ability to draw down NGWS funds" when it "began a policy review of the NGWS grant program" to "ensure compliance with" Executive Order 14290, *Ending Taxpayer Subsidization of Biased Media* (May 1, 2025). Breslin Decl. ¶¶ 8–9. That Order "directs federal agencies to identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of National Public Radio and the Public Broadcasting Service," E.O. 14290 § 3(a), and CPB "issue[s] subgrants to public broad-casting entities" affiliated with these entities, Breslin Decl. ¶¶ 8–9. FEMA restored CPB's ability "to draw down funds," though it "continues to review the NGWS grant program to ensure that the program's design effectively serves its statutory purpose, program goals, and agency priorities." *Id.* ¶¶ 10–11.

FEMA also represented at the hearing that it paid CPB another $834,000 on June 13.  CPB's May 15 Stop Work Order, however, "remain[s] in effect" because, CPB says, it cannot "assur[e]" its "subgrantees that their expenses will be reimbursed" given the "extended periods of uncertainty." Supp. Slavitt Decl. ¶ 15.[4]

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff seeking a preliminary injunction "must make a 'clear showing' that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in his favor, and accord with the public interest."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting *Winter*, 555 U.S. at 22).  But "a court need not necessarily consider each prong to deny relief."  *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 25-cv-00999 (TNM), 2025 WL 1568301, at *3 (D.D.C. June 3, 2025).  "[F]ailure to show any irreparable harm," standing alone, is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Because preliminary injunctive relief is such an "extraordinary remedy," it may not issue "based only on a *possibility* of irreparable harm."  *Winter*, 555 U.S. at 22 (emphasis added) (internal quotation marks omitted).  Consistent with that mandate, the D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  One, "the injury

---

[4] After CPB moved for a preliminary injunction, it also submitted "a formal request" to FEMA to extend the "Period of Performance" for the 2022 NGWS grant program by fifteen months, until December 31, 2026.  ECF No. 34-3.  At the time of the hearing, FEMA was considering but had not yet responded to the request.

must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Put another way, "[t]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up). Two, the injury must truly be "irreparable"—that is, "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

## III. Analysis

The Court's analysis begins and ends with CPB's failure to meet the high bar for showing irreparable harm.[5] FEMA restored CPB's access to PARS in early June and has been reimbursing CPB for the expenses of sub-awardees since then. With the portal now open—and for over a month—CPB cannot show that the preliminary injunction it requests is necessary to avoid imminent irreparable harm.

CPB relies on three theories of irreparable harm. First, CPB contends that the "repeated" portal closures frustrate its "mission" to "effectuate" the NGWS grant. ECF No. 31-1 at 32, 34. It argues that FEMA's back-and-forth over whether "it will allow CPB to submit NGWS expenses" has sown chaos, and both CPB and its sub-awardees need assurances that they will be reimbursed for the costs they incur. *Id.* at 35. Second, CPB argues that FEMA's conduct "endanger[s] the

---

[5] FEMA has not asserted that its reopening of the PARS portal has mooted this case, and it disclaimed any such argument at the hearing. The Court must, however, independently "assure [itself] of jurisdiction." *City of N.Y. v. Nat'l R.R. Passenger Corp.*, 776 F.3d 11, 14 (D.C. Cir. 2015). A case is moot either "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). While CPB sued to challenge FEMA's closure of a portal that the agency has now re-opened, the "voluntary cessation" doctrine keeps this case alive. Under that doctrine, a party's decision to stop the "challenged conduct" renders a case moot only if it can show that it is "absolutely clear [that] the allegedly wrongful behavior [cannot] reasonably be expected to recur." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (citation omitted). FEMA has not sought to make that showing.

safety and lives of citizens who rely on the emergency alert system." *Id.* at 37. And third, it asserts that FEMA is damaging CPB's reputation and goodwill, as "many stations and the public at large are greatly concerned about [its] ability to reimburse the sub-awardees." *Id.* at 38. But none of them help CPB establish irreparable harm.

### A. CPB Has Not Shown That Its Requested Preliminary Injunction Would Prevent Any Irreparable Harm To its Organizational Mission

CPB's leading theory focuses on harm to its organizational mission. CPB's "primary purpose," it argues, is "to ensure the proper procurement of, and payment for, critical infrastructure for the national emergency alert system under the NGWS Grants." ECF No. 31-1 at 34. But it cannot "accomplish" that mission before the NGWS grant expires in September "[i]f FEMA does not reopen the PARS portal in time[] and does not keep the portal open." *Id.* at 35. CPB adds that FEMA "has" already "frustrated" CPB's mission by closing PARS, which forced many stations to pause installations and other work orders, *id.* at 34–36, and that the "instability" resulting from FEMA's "shifting conduct" has made CPB's sub-awardees unwilling "to incur significant new expenses" absent assurances that they will be reimbursed, *id.* at 33, 35.

CPB's mission-based theory of harm falters for several reasons. To be sure, actions that "unquestionably make it more difficult" for an organization "to accomplish [its] primary mission" can sometimes constitute irreparable harm warranting preliminary relief. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). But invoking harm to an organizational mission is no end-run around the demanding test for irreparable harm. The threatened injury that the proposed preliminary injunction would address must still be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief." *Id.* at 7–8 (cleaned up and citation omitted). And, of course, it must be irremediable. *Id.* at 8. CPB has not met these requirements, no matter how the Court parses its theory.

11

To begin, the disconnect between CPB's harm-to-mission argument and the status quo is glaring: much of CPB's theory appears premised on the PARS portal being closed. *See* ECF No. 31-1 at 34–35. Fleshed out, CPB's theory goes like this: its mission, CPB says, is to "effectuate the NGWS Grants" by "procur[ing]" and "pay[ing]" for "critical" emergency-alert-system "infra-structure" updates. *Id.* at 34. That mission, in turn, depends on sub-awardees "order[ing] and pay[ing] for the parts and services in time to submit those reimbursement requests to CPB," so that CPB can then submit them to FEMA. *Id.* at 35. All that must happen "before the NGWS Grant expires [at the end of] September 2025," but "these actions . . . cannot be taken" if PARS is closed. *Id.* And, indeed, virtually all sub-awardee declarants assert that they were forced to halt their system upgrades when FEMA closed PARS, with many explaining that these upgrades might not happen at all if FEMA does not reopen the system. *See, e.g.*, ECF No. 31-4 ¶ 24 ("BRPT believes that if the fund freeze continues until August, it will not be able to complete the transmitter up-grades in time to comply with its NGWS grant . . . ."); ECF No. 31-5 ¶ 24 ("Given the funds hold, however, WNIN has not yet moved forward purchasing and installing this new equipment.").[6]

---

[6] *See also* ECF No. 31-6 ¶ 23 ("As a result of the current closure of the reimbursement portal . . . Radio Caskill has not moved forward with the installation of the new transmitter."); ECF No. 31-7 ¶ 15 ("KRCL does not believe that it would be able to complete its upgrades in time to comply with these deadlines if the funding hold continues."); ECF No. 31-8 ¶ 21 ("Without reim-bursement, and given the funds hold, KEDT has been forced to delay order, purchase, and instal-lation of other components of its NGWS upgrade . . . ."); ECF No. 31-9 ¶ 24 ("As a result of FEMA's hold on the NGWS grant funds, WDCQ has been unable to move forward with installa-tion of the new transmitter . . . ."); ECF No. 31-10 ¶ 13 ("The current hold on funds has placed [KMXT's] investment in jeopardy and created fiscal strain on [its] limited operational budget."); ECF No. 31-11 ¶ 21 ("Because of the repeated FEMA holds SVETC has not yet moved forward with ordering and installing a replacement transmitter and accompanying equipment."); ECF No. 31-12 ¶ 23 ("As a result of the disruption in funding, KTOO had to ask its contractor to pause its order for a generator[.]"); ECF No. 31-13 ¶ 18 ("Given the funds hold, however, KMOS has not moved forward with installation of the antenna."); ECF No. 31-14 ¶ 26 ("Given the funds hold, however, CRP has not yet moved forward with installation of the transmitter . . . ."); ECF No. 31-15 ¶ 21 ("As a result of the disruption of funding, KHNS has not moved forward with the

But to repeat the obvious: CPB's problem—if you can call it that—is that the PARS portal has been open for over a month, and FEMA has been processing CPB's reimbursement requests during that time.  Mintz Decl. ¶ 51; Breslin Decl. ¶ 11.  For the most part, then, CPB's sub-awardee declarations about the effect of a closed portal are stale.  And CPB's claims that FEMA is "run[ning] out the clock on the 2022 NGWS Grant" and preventing it from "implement[ing]" that grant are entirely disconnected from where events stand now—and even where they stood when CPB filed its motion.  ECF No. 31-1 at 35–36.  So at this point, CPB's irreparable-harm argument must rely on the risk that FEMA will shut PARS again.

Before the Court turns to why the threat of a future PARS shutdown is not enough to show irreparable harm to CPB's mission, though, it pauses to explain why CPB has not shown, based on any injury stemming from events that have already happened, that its proposed preliminary injunction is warranted.  To be sure, CPB has shown that FEMA's handling of the portal earlier this year caused its sub-awardees to press pause on certain upgrades.  And because part of CPB's declared mission hinges on its sub-awardees completing those upgrades, CPB has also shown that FEMA—at least for some time—made it more difficult for CPB to fulfill that mission.  But "the purpose of a preliminary injunction" is "not to remedy a past wrong."  *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768 (RDM), 2016 WL 471274, at *5 (D.D.C. Feb. 8, 2016).  So any past injury CPB suffered because of "obstacles" FEMA once placed in its path of administering the NGWS grants, but that are now removed, does not justify preliminary injunctive relief.

---

installation of the equipment it has purchased . . . ."); ECF No. 31-16 ¶ 12 ("KRBW has not been reimbursed for [the cost of new equipment] and was informed by the CPB that all funds have been placed on a hold by FEMA."); ECF No. 31-17 ¶ 27 ("All Stations have been informed by CPB that all subgrant funds have been placed on hold by FEMA."); ECF No. 31-18 ¶ 11 (similar).

To be sure, CPB could also contend that these past events will injure its organizational mission going forward, even if the PARS portal remains open and apart from any threat of it closing again, because the 2022 NGWS grant expires at the end of September.  CPB does not seem to argue this point explicitly, but some sub-awardees say that they may be unable to complete their upgrades in time because they "missed [their] window of opportunity" because FEMA closed PARS.  ECF No. 31-15 ¶ 25; *see also* 31-13 ¶ 26.  For example, one was forced to pause installation of an antenna when FEMA closed the portal and now cannot proceed "for the remainder of the year" because the "Installation Company . . . has a full schedule with other contracts signed." ECF No. 31-13 ¶¶ 18–26.  Unless it "can somehow fit [the station] back into their schedule," the sub-awardee explains, the antenna installation will not "be completed before" the NGWS grant expires in September 2025.  *Id.* ¶ 26.  And with the sub-awardees unable to upgrade their systems in time because of these past portal closures, the argument would go, CPB will suffer irreparable harm to its mission of administering the grant program.  But such injury would hardly be imminent and certain, given that FEMA is considering CPB's pending request to extend the program's performance period past the end of September.  *See* ECF No. 34-3.  More to the point, the preliminary injunction requested by CPB—ordering FEMA to keep PARS open—would not prevent any injury that stems only from past closures and the end-of-September deadline.

Thus, as mentioned above, what is left of CPB's theory—now that the PARS portal is up and running again—is that it is facing future irreparable harm to its mission because of the threat that FEMA will shut down PARS again.  But CPB fails to meet its burden on this theory as well.

A party seeking preliminary relief must show "that irreparable injury is *likely*"—not just "possible"—"in the absence of an injunction."  *Singh v. McConville*, 187 F. Supp. 3d 152, 160 (D.D.C. 2016) (quoting *Winter*, 555 U.S. at 22) (emphasis in original).  Mere "uncertainty" is not

enough, and a court will "interven[e] to prevent potential injury from prospective government misconduct" only when "such misconduct is imminent." *Id.* at 163 (quoting *Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir. 1982)). To the extent that CPB's organizational harm theory turns on a showing that FEMA will likely close the PARS portal again, CPB has not met its burden. It offers no reason to think it will, other than nodding to what happened in the past. And again, the portal has now been open for over a month, and FEMA has been processing CPB's reimbursement requests. Mintz Decl. ¶ 51; Breslin Decl. ¶ 11. Is it "possible" that FEMA might press pause on PARS? Of course. But CPB does not show that it will likely do so.

CPB also might argue that the mere *threat* of closure under these circumstances (whatever its likelihood) is likely to cause irreparable harm to its mission. Indeed, on CPB's telling, FEMA's past actions have caused such "chaos" and uncertainty that, even now, "no business is willing to incur significant new expenses" unless FEMA guarantees that it will permit reimbursement. ECF No. 31-1 at 35–36; *e.g.*, ECF No. 31-4 ¶ 27. CPB does not elaborate. Presumably, though, the theory is this: again, CPB's mission is to administer the NGWS grant; to carry it out, sub-awardees must complete upgrades and seek reimbursement from CPB. But its sub-awardees are unwilling to do their part with the threat of future portal closures—and unreimbursed expenses—looming over their head. CPB, then, can fulfill its mission only if the Court orders FEMA to keep PARS open.[7]

Still, this theory of irreparable harm comes up well short. CPB has not shown that its sub-awardees are *likely* to fail to upgrade their infrastructure and seek reimbursement from CPB, nor

---

[7] As noted, CPB's proposed preliminary-injunction order also asks for FEMA to give it 30 days' notice and an explanation for any future portal closure. ECF No. 30 at 2; ECF No. 31-20 at 2. As far as the Court can tell, though, CPB's proposed injunction would not permit FEMA to close PARS without asking the Court to lift the injunction. So CPB's requested relief is, at bottom, a prohibition on any future portal closure without the Court's permission.

that that *FEMA* is the reason some might not do so. And even if CPB could show as much, any harm to its organizational mission would still not be great enough to meet the requirements for irreparable harm.

One preliminary point: ordinarily, a plaintiff cannot loop in harm suffered by third parties to obtain a preliminary injunction. *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012). CPB toes that line because the gist of its claim is that sub-awardees—not CPB itself—risk incurring expenses that they cannot reimburse if PARS shuts down again. ECF No. 33 at 21–22; ECF No. 31-1 at 35–36. But, as explained, CPB describes *its* mission as dependent on the sub-awardees making those necessary purchases. So although CPB walks a tightrope, this potential injury to the sub-awardees could injure CPB too, at least in theory. But not on the record here.

Start with the likelihood that CPB's sub-awardees will not move forward with their system upgrades. CPB's factual showing on that score is inadequate to meet its burden. It suggests that its sub-awardees are not "willing to incur significant new expenses" given the threat of portal closure. ECF No. 31-1 at 35. And for support, CPB cites several sub-awardee declarations that make the following identical assertion: "without assurances that the portal will remain open," they are "*reluctant* to move forward with new NGWS grant expenditures, because of the uncertainty that FEMA's actions of repeatedly closing the portal without notice or explanation have caused." *E.g.*, ECF No. 31-4 ¶ 27 (emphasis added). But for CPB's theory of organizational mission-based harm to pan out, the sub-awardees must be more than reluctant to make the upgrades. Rather, they must be unlikely to make them. And, as FEMA rejoins, "saying one is 'reluctant to move forward' is a far cry from saying that [one] will not move forward." ECF No. 33 at 24. That alone is enough to dispense with CPB's claim of irreparable harm to its organizational mission.

Second, CPB has not shown that any organizational harm from the sub-awardees failing to move forward would "directly result" from a threat that FEMA will close the portal. *Wis. Gas Co.*, 758 F.2d at 674 ("[T]he movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin"). Surprisingly—at least to the Court—CPB's May 15 Stop Work Order apparently remains in effect. So the sub-awardees cannot implement any upgrade plans, no matter how each may independently assess the situation. Thus, at this point, any harm to CPB caused by a sub-awardee's failure to move ahead is self-inflicted, and therefore does not "satisfy the irreparable harm criterion." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 33 (D.D.C. 2014) (citation omitted).

Third, even assuming some sub-awardees are not likely to complete planned upgrades by the end of September, CPB has not shown that any related harm to its mission would be significant enough to warrant preliminary injunctive relief. That is so in part because CPB's mission is much broader than administering the NGWS grant or, in CPB's words, "procur[ing]" and "pay[ing] for[]" critical infrastructure for the national emergency alert system." ECF No. 31-1 at 34. No doubt, administering the grant program is *one* of CPB's tasks. *See* Mintz Decl. ¶ 2. But it is not all CPB does. Quite the opposite—on its own account and on that of Congress. CPB's declarant explains CPB was established in 1967—when there was no emergency alert system, let alone federal grants to update it—to become "the steward of the federal government's investment in public broadcasting." *Id.* ¶ 1. So CPB's "mission," even he says, is sweeping: "to ensure universal access to non-commercial, high-quality content and telecommunications services." *Id.* ¶ 2. Or, as Congress put it, "to facilitate the development of public telecommunications" and "make" such "services available" and "access[ible]" to "all citizens of the United States." 47 U.S.C. §§ 396(a)(7), (9)–(10); *see* ECF No. 31-1 at 36–37. And CPB does that by "distributing" Congressionally "appropriated

funds" to "public media stations across the country"—funds that have nothing to do with the NGWS grant program or the emergency alert system. Mintz Decl. ¶ 2. *That* program, as CPB says itself, is one of "two sets of federal grants" that it administers "*[i]n addition to*" disbursing appropriated funds. *Id.* (emphasis added). In other words, implementing the NGWS grant program—which CPB says FEMA is making harder—appears to be but a slice of CPB's mission, as opposed to its "primary" one. *League of Women Voters*, 838 F.3d at 9. So even assuming that, without preliminary injunctive relief, some unknown number of sub-awardees will not update their emergency-alert systems before the 2022 NGWS grant expires, CPB has not shown that any harm to its sweeping organizational mission would be "great" enough to qualify as irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted).[8] On top of that, even if CPB's mission were as narrow as it suggests, it is still hard to see how any harm resulting from a less-than-full implementation of the 2022 NGWS grant would be great and certain, let alone both. After all, CPB has *three* other NGWS grants for fiscal years 2023, 2024, and 2025 that will permit it to "procur[e]" and "pay[] for" infrastructure upgrades. ECF No. 31-1 at 34; Mintz Decl. ¶¶ 23, 69; Supp. Slavitt Decl. ¶ 8.

In the end, "CPB and the NGWS sub-awardees" want "stability and predictability." ECF No. 31-1 at 35. That is understandable. But "instability and unpredictability" are not, as CPB

---

[8] For this and other reasons, CPB's reliance on *League of Women Voters* is misplaced. ECF No. 31-1 at 34–35. There, an organization faced irreparable harm to its "primary mission of registering voters" if a proof-of-citizenship requirement remained on voter-registration forms, "because after the registration deadlines for" an imminent "election pass[ed]," there could "be no do over and no redress." 838 F.3d at 9 (cleaned up and citation omitted). That case is very different from this one, even putting aside that administrating the NGWS grant program is not CPB's primary mission. CPB has not made a similar showing that harm to its mission is likely. Nor can CPB point to a similar certain and imminent deadline after which any harm would be irremediable because FEMA is considering CPB's pending request to extend the program's performance period past the end of September. *See* ECF No. 34-3.

suggests, sufficient to find irreparable harm. *Id.* at 33 (quoting *Learning Resources, Inc. v. Trump*, No. 25-cv-1248, 2025 WL 1525376, at *14 (D.D.C. May 29, 2025)). Much more is required, and the main case that CPB relies on proves the point. In *Learning Resources*, two small toy companies challenged President Trump's imposition of sweeping tariffs on foreign goods, which were "so high as to effectively prevent" them from importing any goods. 2025 WL 1525376, at *4–5. The companies could not "possibly absorb the costs of increased tariffs" and could be forced to "significantly scale back operations," "close facilities," and "possibly sell their businesses." *Id.* at *13. On top of that, their "financial recovery" would be "limited to the value of any tariffs they wrongly" paid; the companies could never "recover lost profits, lost customers, or the additional costs of finding replacements for high-tariff imports." *Id.* at *14 (cleaned up). Those plaintiffs, Judge Contreras found, met their burden of showing irreparable harm "because the tariffs . . . pose[d] an existential threat to their business." *Id.* at *13. Nothing similarly threatens CPB's existence or, for the sake of argument, its mission. And unlike here, the plaintiffs in that case met their burden of showing an injury that was certain, great, imminent, irremediable, and directly caused by the challenged action.

On this record, CPB has not shown irreparable harm to its organizational mission stemming from the threat of a future portal closure. Indeed, the Court is unaware of any court finding irreparable harm on a theory and a record akin to that advanced here.

### B. CPB's Other Theories of Irreparable Harm to the Public and Its Reputation Fail as Well

CPB presses two other theories of irreparable harm, but they fail as well, partly for reasons now familiar, and partly for others explained below.[9]

---

[9] CPB's motion also gestures at "nine employees who are fully or partly funded through the NGWS Grant" whose salaries CPB pays and then reimburses through PARS, ECF No. 31-1 at

Its second theory—that FEMA's conduct "endanger[s] the safety and lives of citizens who rely on the emergency alert system," ECF No. 31-1 at 37—stumbles at the starting gate because any harm to the public is not CPB's own. *See City of Moundridge v. Exxon Mobile Corp.*, 429 F. Supp. 2d 117, 129 (D.D.C. 2006) (preliminary injunction movants must "demonstrate[e] irreparable harm to themselves"). And it is speculative because it relies on a causal chain of events that on this record are merely possibilities, not probabilities.

CPB's third theory—that FEMA's actions "have harmed, and continue to harm," its reputation—fares no better. ECF No. 31-1 at 38. For one thing, any purported reputational damage that CPB suffered when PARS was closed is a "past harm" that, as explained, does not justify forward-looking relief. *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 567 (D.D.C. 2018) (citation omitted). And as for any prospective harm to its reputation, especially given that the PARS portal is open, CPB has not made the required "concrete and corroborated" showing. *Cardinal Health, Inc.*, 846 F. Supp. 2d at 213 (citation omitted).

CPB vaguely gestures at "business and grant partners" losing "faith in CPB's ability to administer" the grant. ECF No. 31-1 at 38. But while the record shows that sub-awardees "have expressed their frustration with CPB," and CPB's relationship with them has been "strained," the sub-awardees complain, at bottom, about "instability" that "*FEMA* has created" and blame "*FEMA*" for the "repeated disruptions." Mintz Decl. ¶¶ 70–73 (emphasis added); Slavitt Decl.

---

24, and CPB's declarant contends that "[t]he holds and significant delays" forced CPB "into the position of likely furloughing or terminating" them "by July," Mintz Decl. ¶ 79. But CPB confirmed at the hearing that it is not advancing a theory of irreparable harm based on any terminations that it said were "likely" when the portal was closed. For good reason: with the portal now open, any claim that CPB might have to furlough or fire employees is pure speculation, especially when it was not forced to do so when PARS was closed. It is also the type of "economic loss" that does not qualify as irreparable harm. *Indiana v. Haaland*, No. 24-cv-1665 (RBW), 2024 WL 5213401, at *11 (D.D.C. Dec. 24, 2024) (citation omitted).

¶¶ 56, 59–60.  Little suggests that the sub-awardees fault *CPB* for any such disruptions, which were of course outside its control.  *See* ECF No. 32 at 256; Mintz Decl. ¶ 72.  To the contrary, all declarations make clear that CPB's sub-awardees know FEMA is responsible for past portal closures.  *See, e.g.*, ECF No. 31-4 ¶ 27 (referencing "*FEMA's* actions of repeatedly closing the portal").

Moreover, CPB has not shown that is likely that any harm to its reputation will affect it in a "concrete" way going forward.  CPB vaguely states that "[t]his lack of goodwill *impacts*" its "sub-awardees' willingness to participate" in the grant program down the road.  Mintz Decl. ¶ 61 (emphasis added).  But not one sub-awardee says it will not participate, and probably for good reason—after all, they also assert that the federal grants are important to help them upgrade their infrastructure and send emergency alerts.  And CPB is the only organization from whom they can obtain these grants.  So any sub-awardee's loss of faith in CPB's ability to administer the NGWS grant would not count for much.  *Compare Brown v. District of Columbia*, 888 F. Supp. 2d 28, 33 (D.D.C. 2012) (plaintiff failed to show "that other law schools have refused or would refuse to hire her due to defendants' denial of tenure"), *with Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103–04 (D.D.C. 2017) ("If those customers conclude that they cannot rely on [plaintiff] for on-time delivery, they are likely to switch contractors or at least reduce the routes covered by [plaintiff].").

For these reasons, CPB has not identified the kind of "damage" to its reputation that may, "under some circumstances," constitute irreparable injury.  *Cardinal Health, Inc.*, 846 F. Supp. 2d at 213 (citation omitted).

*    *    *

The Court recognizes that FEMA's unpredictable and at times apparently unexplained actions earlier this year have caused problems for CPB and its sub-awardees, and nothing in this opinion is meant to dismiss or minimize those problems. But on the record before it, CPB falls far short of satisfying the "high standard for irreparable injury" that warrants the preliminary relief they request. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

## IV.    Conclusion

For all these reasons, the Court will deny CPB's Motion for Preliminary Injunction. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: July 15, 2025